No. 86-72

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

THE STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

KENNETH LAIRD,

        Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Gary E. Wilcox, Billings, Montana

    For Respondent:

        Mike Greely, Attorney General, Helena, Montana
        George Schunk, Asst. Atty. General, Helena
        Harold F. Hanser, County Attorney, Billings,
        Montana; Donna Heffington, Deputy County Attorney

Submitted on Briefs: Dec. 11, 1986

Decided: February 9, 1987

Filed: **FEB 9 - 1987**

_Ethel M. Harrison_
_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Defendant Kenneth Laird appeals his conviction for sexual intercourse without consent following a jury trial in the Thirteenth Judicial District in and for the County of Yellowstone. We affirm his conviction.

Three issues are raised on appeal:

1. Whether the District Court erred in denying defendant's request to cross examine the State's witnesses on an alleged prior assault made against the victim.

2. Whether the District Court erred in admitting the testimony of the state's expert witness on the probability of sexual assault upon the victim.

3. Whether the District Court erred in admitting as evidence "pornographic" materials found in defendant's apartment.

In March 1985, nine year old Katherine lived with her mother Melissa and two younger sisters in an upstairs room at the Acme Hotel in downtown Billings. The defendant lived with his common law wife a floor beneath them in room No. 15. Defendant and Melissa had known each other on Billings' south side for several months before Melissa moved her family to the Acme. Defendant moved to the Acme a month or so after Melissa's family. Defendant and Melissa were friends, so in the months between defendant's move and the early part of March, defendant visited Melissa several times a week to drink coffee and talk. Melissa's children were often present during these visits.

On Friday, March 8, Katherine was on her way home from school when, as she started up the stairs to her apartment, she saw defendant in the hallway. He coaxed her near to him

- 2 -

by offering her candy, then grabbed her by the hand, pulled her into his room, and locked the chain lock on the door. Defendant's wife was not there. Defendant then undressed Katherine and raped her orally, vaginally and rectally. Katherine testified that defendant showed her "dirty" magazines before raping her, telling her that he was going to do to her what the naked people in the magazines were doing. When he finished raping Katherine, defendant told her that if she told on him, he would do it again.

Katherine did not tell anyone what happened for several days. In that period her mother noticed that her daughter had trouble sleeping, was scratching her vaginal area and made frequent trips to the bathroom. Around 1:30 on Sunday morning, March 10, Katherine, who was sleeping near her mother, (who was watching a late movie on t.v.), woke crying. When her mother asked her what was wrong, Katherine continued crying and insisted that if she told, her mother wouldn't love her anymore. Melissa, aware that something was wrong, asked Katherine if someone had hurt her, and learned that Katherine had been assaulted. In her rage, Melissa went down to defendant's apartment, broke through his door and attacked him with a kitchen knife. She was arrested and taken to jail until March 15. She did not spend any time alone with her children until that time.

At about 11 a.m. the morning of March 10, a Billings police officer took the defendant's statement at the Billings Deaconess Hospital. At that time defendant maintained that an unknown lady had attacked him with a knife, and that although she may have lived in the building, he did not know who she was. In another statement to police on March 12, defendant admitted knowing Melissa and her family, but denied any close familiarity with them. He stated that he believed

Melissa made up the sexual assault story to cover for her attack on him.

Sometime after the assault defendant moved from apartment 15, where Katherine was raped, to a new apartment in the building, apartment 29. On March 14, defendant consented to a search of his new apartment. The detective explained that the purpose of the search was to find pornography relating to defendant's sexual assault on Katherine. Seven magazines were confiscated. At trial defendant admitted that the magazines confiscated from apartment no. 29 were the same that he had in his earlier apartment, number 15.

Katherine was examined by a doctor, Doctor Patrick Sauer on March 13. His conclusion from the examination, as well as from Katherine's statements to him, was that he was 99.99 percent sure that Katherine had been sexually assaulted. Dr. Sauer testified that Katherine's hymen was gone and that her vaginal opening was twice the size normal for a child of her age. He further testified that he found three abrasions inside the vaginal opening, each approximately ½" in length.

On April 23, 1985 Social Worker Susan Kerns of the Yellowstone County Resource Department gave her statement to the police. She had been the social worker assigned to Melissa and her family since August of 1984. Her statement contained two pertinent passages to this appeal:

> Q. (by the police) . . . [H]ad you occasion to talk to the children or have anything to do with the family within a couple of weeks previous [to the assault]?
> A. I saw the family about two weeks earlier.
>
> Q. And did you notice anything peculiar at that time?
> A. [W]hile I was there I noticed that Katherine getting up from taking a nap and scratching herself in the vaginal area.

\* \* \* \*

Q. (by the police) . . . Since (the rape) have either of the children mentioned anything new to you?
A. There is a possibility Katherine may have been assaulted once by a man who picked her up on the street as she was walking home from school.

Q. Do you recall or do you know when that might have been?
A. No, and I don't know what the man's name was, she did not have the name, ah I, just don't know how we can track that down.

Q. Did she, or was she able to describe to what extent the assault occurred?
A. No.

The first of the three issues concern these comments by Ms. Kerns. Defendant maintains that it was error for the District Court to prevent defendant from asking Dr. Sauer whether a previous assault could be the explanation for the physical injuries he used in concluding that she had been assaulted. Defendant also argues that the testimony of social worker Kerns on Katherine's apparent vaginal irritation two weeks before the assault was evidence he should have been able to use to mitigate the adverse physical evidence against him. The implication was that Katherine's irritation was caused by an earlier assault and that Katherine was fabricating the charge against defendant. The trial court ruled that defense counsel was not allowed to examine any State's witness regarding any alleged prior assault. We affirm its decision.

Defense counsel intended to bring the matter up for cross examination under § 45-5-511(4), MCA. Section 45-5-511, MCA, provides in relevant part:

(4) No evidence concerning the sexual conduct of the victim is admissible in prosecutions under this part except:

- 5 -

(a) evidence of the victim's past sexual conduct with the offender;

(b) evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease which is at issue in the prosecution.

It is our view that neither of the above quoted exceptions pertain to the alleged incident of assault. First, this incident was not alleged to have occurred with the defendant and, even were it so alleged, would not have been exculpatory because of the victim's and defendant's ages. Second, the alleged assault hardly constituted a specific instance of the victim's sexual activity. The defendant admittedly knew very little about the speculated earlier assault. The record does not even indicate if the incident was sexual in nature. Ms. Kern's statement that there was a "possibility" of assault, without further explanation, was an inadequate offer of proof and was insufficient to support any cross examination under the exceptions of § 45-5-511(4)(b).

Defendant also argues that Dr. Sauer's opinion testimony on whether there was a rape went to the ultimate issue before the Court and was inadmissible evidence of Katherine's veracity. Defendant cites the following trial testimony to support his contention:

Q. [Deputy County Attorny) Based on your examination of this little girl, did you arrive at a diagnosis?
A. [Dr. Sauer] Based on the information that she gave me, based on her physical exam, reviewing all the information, I feel the diagnosis is that she was sexually assaulted.

Q. All right. Is that the diagnosis that you placed on your report?
A. It is on the dictated report, my final impression says "Possible sexual assault." I think

you need to understand that this is, and especially in these kinds of circumstances where I feel it is important to put down what the child tells to you as soon as possible, and I am still waiting for further tests, I will put "possible" until I have reviewed it in my mind and made my final diagnosis.

Q. Based upon the evidence you had before you at that time, how likely do you feel it was that the child had been sexually assaulted?
A. 99.99 percent.

Defendant invites this Court to conclude that when an expert testifies about his findings, the expert is in fact commenting on the weight and credibility of the evidence given by the victim. We do not accept the defendant's invitation. It is clear that Dr. Sauer was not testifying about Katherine's veracity. Instead, Dr. Sauer was asked to give his diagnosis of Katherine based upon his experience as a pediatric specialist. The physician can testify as to his clinical impression and give an opinion based upon his experience and first hand observation. State v. Dickens (1982), 198 Mont. 482, 647 P.2d 338. Dr. Sauer said he was 99.99 percent certain Katherine had been sexually assaulted. He did not say he was certain she was telling the truth. He also did not make any conclusions regarding the ultimate issue, i.e., whether the defendant raped Katherine. For the above reasons, defendant's assertion that the District Court erred in admitting Dr. Sauer's testimony on the probability of sexual assault is unsupported in law.

The final issue raised by the defendant is whether the District Court erred in admitting as evidence the magazines found in his apartment. Defendant argues that the magazines were inadmissible first because of lack of foundation and second because the probative value of the evidence was outweighed by its prejudicial effect.

Defendant argues that no evidence or testimony was presented establishing that the magazines taken from his second apartment were similar to or were the actual magazines shown to Katherine. Defendant maintains that magazines were admitted for the sole purpose of prejudicing the jury.

The introduction of evidence at trial is controlled by several statutory provisions. A threshold inquiry is whether the evidence is relevant. Rule 401, M.R.Evid. provides:

> Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or a hearsay declarant.

The magazines were relevant because they tended to buttress Katherine's credibility. She had told investigators that she was shown "dirty" magazines and such magazines were found in the search of defendant's room.

The defendant contends that the evidence was unfairly prejudicial, citing Rule 403, M.R.Evid:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The defendant asserts that physical presentation of the magazines at trial was unnecessary. He maintains that the State did not need to admit the magazines as evidence to establish that the magazines were confiscated from his apartment and that the evidence bolstered Katherine's testimony. In defendant's view, the magazines were unnecessary evidence admitted solely for prejudicial purposes.

The established rule of law is that a district court's weighing of potential prejudice against probative value will be upheld absent an abuse of discretion, State v. Austad (1982), 197 Mont. 70, 83, 641 P.2d 1373, 1380. We find no abuse of discretion by the trial court in finding that the probative value of the magazines outweighed potential prejudice to the defendant. The magazines were necessary to corroborate Katherine's testimony. It was within the trial court's discretion to rule on their admission as physical evidence.

Defendant also questions the sufficiency of the foundation supporting the admission of the magazines. Defendant asserts that although Katherine testified she had been shown magazines, she never testified at trial that the magazines in evidence were those magazines defendant showed her.

Once again this matter is within the trial court's discretion. The trial court's determination of the adequacy of foundation should not be overturned unless there is a clear abuse of discretion. State v. Armstrong (1980), 37 St.Rep. 1563, 1579, 616 P.2d 341, 355. In the instant case, defendant admitted that the magazines presented at trial were the same present in apartment 15 on March 8. Given this admission it is clear the trial court was justified in finding that an adequate foundation had been presented. The trial court did not abuse its discretion by allowing the magazines into evidence.

For the reasons stated herein, the findings of fact and conclusions of law of the District Court are affirmed.

John C. Sheehy
_____
Justice

We Concur:

_____

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_Frank B. Morrison_

_____

_L. C. Gulbrandson,_

_William E. Hunt_
Justices