Justice Brian Morris
delivered the Opinion of the Court.
¶ 1 Jason Lee Schmidt (Schmidt) appeals his conviction in the Second Judicial District Court, Silver Bow County, for mitigated deliberate homicide. We affirm.
¶2 We review the following issues on appeal:
¶3 Did the jury instructions and verdict form at trial render Schmidt’s conviction for mitigated deliberate homicide a ‘legal impossibility” under Demontiney?
*282 ¶4 Did the District Court properly deny Schmidt’s request for a lesser included offense instruction?
¶5 Did the District Court properly deny Schmidt’s motion to suppress evidence of his confession ?
¶6 Did the District Court properly deny Schmidt’s motion in limine to allow evidence that the victim had wielded a knife?
¶7 Did the District Court properly deny Schmidt’s request for a mistrial?
¶8 Did the District Court properly exclude a photograph of the victim offered by Schmidt?
¶9 Did the District Court properly deny Schmidt’s motion for a directed verdict?
¶10 Did the District Court properly instruct the jury on weapons enhancement?
¶11 Did the District Court properly impose restitution for the victim’s funeral expenses?
FACTUAL AND PROCEDURAL BACKGROUND
¶12 James Correia (Correia) died from stab wounds outside the Irish Times bar in Butte on March 24, 2007. Correia had gone to the Irish Times with his friend Chase Hanley (Hanley). Correia and Hanley arrived at the Irish Times at approximately 12:30 a.m. Correia and Hanley earlier had visited three other bars. Correia was visiting from out of town and told Hanley that he wanted to see the “bad places” in Butte.
¶13 Schmidt arrived at the Irish Times around midnight with his wife, his brother, and a group of friends. The group had visited several bars en route. They had been celebrating Schmidt’s wife’s birthday.
¶14 Gunnar Fitzpatrick (Fitzpatrick) was working as the bartender and bouncer that night at the Irish Times. Fitzpatrick noticed Correia immediately because of the way he was moving and interacting with the other patrons. Fitzpatrick left his position behind the bar more than once to “defuse” potential altercations between Correia and other patrons. Fitzpatrick ultimately asked Correia and Hanley to leave.
¶15 Fitzpatrick also had to intervene in an argument between two women. Correia got involved in an altercation with the two women as he and Hanley were leaving. Hanley claimed that one of the women slapped Correia, and that, in response, Correia had pulled her hair and caused her to fall. Schmidt’s wife claimed that Correia punched her in the face. Another witness corroborated Schmidt’s wife’s claim, but added that Schmidt’s wife had slapped Correia first.
*283 ¶16 Accounts differ as to who instigated the confrontation, who was involved, and what Correia did. Most of the witnesses had been drinking. Many were unclear about what they saw. All the witnesses agreed that a brawl involving a number of people took place. Will Smith (Smith), a witness who was at the Irish Times, testified that Schmidt’s brother had tried to assault Correia. Smith tried to hold Schmidt’s brother away from Correia, but two women grabbed Smith by the hair to make him let go. Smith testified that both Schmidt and his brother were trying to fight Smith in the middle of the bar. Bouncers broke up the fight and threw them out.
¶17 Fitzpatrick saw Correia at the center of the fight. Correia had Schmidt in a headlock and was “throwing uppercuts at him.” Fitzpatrick attempted to break up the fight. Schmidt threw a punch that hit Fitzpatrick on the shoulder. Fitzpatrick finally separated the two men. Schmidt continued to yell profanities at Correia. Fitzpatrick escorted Correia and Schmidt outside. Correia gestured at one of the bouncers as though to challenge him to a fight.
¶18 Smith testified that Correia was “trying to stay neutral” outside the bar. Correia and Hanley backed toward their car, but two of the women from the bar followed them. Correia and the women continued to yell at each other. Correia took off his shirt and attempted to hit one of the women with it. The second woman responded by shoving Correia. Correia hit her.
¶ 19 Schmidt saw this exchange and “tried to assault” Correia. Schmidt claimed that when he saw Correia hit the woman, he called Correia “a piece of shit,” and that Correia had responded by attacking him. Correia and Schmidt started fighting. The fight quickly devolved “into something of a glorified wrestling match.” Neither fighter had the upper hand as both Schmidt and Correia were merely “jockeying for position.”
¶20 Correia was on top of Schmidt. Schmidt pulled a knife out of his right front pocket, flipped it open, and stabbed Correia in the leg. Schmidt stabbed Correia three more times, once in the lower abdomen, and twice in the chest. Schmidt stabbed with such force that the hilt of the knife left abrasions on Correia’s skin. Schmidt’s knife blade penetrated Correia’s diaphragm and his heart. Correia climbed off Schmidt. He stood for a moment before limping toward Hanley.
¶21 Correia held his right side as he walked. Correia collapsed. Hanley noticed Correia’s wounds and saw lots of blood. Someone applied pressure to Correia’s wounds with a tee shirt. Another person called 911. The responding officer called for medical backup. The *284 officer accompanied Correia to the hospital. Correia died shortly after arriving at the emergency room.
¶22 Schmidt came at Smith with a knife after Schmidt and Correia had stopped fighting. Smith ducked out of the way and took off. Zachary Hayes knew Schmidt from high school and was at the Irish Times. Hayes saw Schmidt pacing back and forth in the alley, and heard him swearing. Schmidt fled down the alley as Hayes approached him. Schmidt threw the knife into a dumpster and ran toward Butte High School. A friend called Schmidt on his cell phone and picked him up near the school. Schmidt threw his cell phone out the car window. Schmidt burned his bloody clothes in a wood stove when he got home. Schmidt took a shower, grabbed another knife, and went for a drive.
¶23 Schmidt initially denied any wrongdoing to police. He eventually admitted to stabbing Correia. Schmidt claimed that Correia had him pinned and was striking him repeatedly. Schmidt stated that he was afraid Correia was going to kill him. Schmidt claimed that he was trying to defend himself. Schmidt lied to the officers about his clothes. He told the officers that they would find the clothing that he had been wearing during the fight in his bedroom, along with the knife that he had been carrying. In fact, he had burned the clothes in his woodstove and he had thrown the knife into a dumpster.
¶24 Schmidt moved to suppress evidence of his confession and evidence obtained during a search of his home. Schmidt claimed that police officers had given him deficient Miranda warnings. Schmidt also moved for a new trial in response to a potential juror’s comment about a witness for the defense. Schmidt argued that the potential juror’s comment had tainted the jury panel. The District Court denied Schmidt’s motions.
¶25 The District Court issued thirty-three jury instructions dining the trial. The court instructed the jury to consider any mitigating factors at the same time that it considered whether the State had established all of the elements of deliberate homicide. The court also instructed the jury on the lesser included offense of mitigated deliberate homicide at Schmidt’s request. The court used a verdict form similar to one Schmidt had proposed. The jury convicted Schmidt of mitigated deliberate homicide following a seven day trial. The jury indicated on the verdict form that it found Schmidt not guilty of deliberate homicide. The District Court imposed a sentence that included a weapons enhancement. The court suspended the weapons enhancement in exchange for Schmidt’s having agreed to pay $24,347.18 in restitution to Correia’s family.
*285 STANDARD OF REVIEW
¶26 We review a district court’s jury instructions to determine whether the instructions, as a whole, fully and fairly instruct the jury on the applicable law. State v. Hudson, 2005 MT 142, ¶ 10, 327 Mont. 286, 114 P.3d 210. The district court has broad discretion in formulating jury instructions. Hudson, ¶ 10. The instructions must prejudicially affect the defendant’s substantial rights to constitute reversible error. Hudson, ¶ 10.
¶27 We review for clear error a district court’s denial of a motion to suppress evidence. State v. Thomas, 2008 MT 206, ¶ 9, 344 Mont. 150, 186 P.3d 864. We review for an abuse of discretion a district court’s grant or denial of a motion in limine. Tin Cup County Water v. Garden City Plumbing & Heating, Inc., 2008 MT 434, ¶ 46, 347 Mont. 468, 200 P.3d 60. We review for abuse of discretion a district court’s denial of a motion for a mistrial. State v. Dubois, 2006 MT 89, ¶ 33, 332 Mont. 44, 134 P.3d 82. We review for abuse of discretion a district court’s evidentiary ruling. State v. Damon, 2005 MT 218, ¶ 12, 328 Mont. 276, 119 P.3d 1194.
¶28 We review de novo a district court’s denial of a motion for a directed verdict. State v. Marler, 2008 MT 13, ¶ 20, 341 Mont. 120, 176 P.3d 1010. We review de novo the legality of a sentencing condition. State v. Park, 2008 MT 429, ¶ 14, 347 Mont. 462, 198 P.3d 321. We review for legality only a sentence that includes at least one year of incarceration. State v. Perkins, 2009 MT 150, ¶ 8, 350 Mont. 387, 208 P.3d 386.
DISCUSSION
¶29 Did the jury instructions and verdict form at trial render Schmidt’s conviction for mitigated deliberate homicide a ‘legal impossibility” under Demontiney ?
¶30 A person commits the offense of mitigated deliberate homicide when they satisfy all of the elements necessary for deliberate homicide “but [do] so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse.” Section 45-5-103(1), MCA. Schmidt argues that the jury’s acquittal on the charge of deliberate homicide and conviction of mitigated deliberate homicide created a ‘legal impossibility” that requires his immediate release from custody.
¶31 This Court determined a similar result to be “truly legally inconsistent” in Demontiney v. Mont. Twelfth Judicial Dist. Court, 2002 MT 161, 310 Mont. 406, 51 P.3d 476. The State charged *286 Demontiney with deliberate homicide. The district court instructed the jury on mitigated deliberate homicide over Demontiney’s objection. Demontiney, ¶ 5. The district court instructed the jury first to consider the charge of deliberate homicide. Jurors were to consider the lesser charge of mitigated deliberate homicide only if they reached a verdict of not guilty, or were unable to agree, on the greater charge. Demontiney, ¶ 7. The jury entered a verdict of not guilty to deliberate homicide and guilty to mitigated deliberate homicide. Demontiney argued that the jury’s verdict was “truly legally inconsistent.” Demontiney, ¶ 8.
¶32 This Court reasoned that “a finding of guilty on mitigated deliberate homicide requires a finding of every element of deliberate homicide plus an additional finding of extreme mental or emotional stress.” Demontiney, ¶ 20. Both the jury instructions and the verdict form directed the jury to consider the lesser charge only if the jury found the defendant not guilty of the greater charge. Demontiney, ¶ 7. This Court assumed that the jury first acquitted Demontiney on the deliberate homicide charge and concluded that there was “no logical way the jury could acquit on deliberate homicide and then consider mitigated deliberate homicide.” Demontiney, ¶ 16 (emphasis in original). The jury’s acquittal on the charge of deliberate homicide precluded a conviction on mitigated deliberate homicide. Demontiney, ¶ 24.
¶33 Justice Leaphart agreed that the district court’s instruction incorrectly applied the law. Demontiney, ¶ 32 (Leaphart, J. dissenting). He argued, however, that Demontiney had not been prejudiced by this error. Demontiney, ¶ 33 (Leaphart, J. dissenting). Justice Leaphart pointed out that the jury’s not guilty verdict to the offense of deliberate homicide did not necessarily mean that Demontiney had not committed all of the elements of deliberate homicide. Demontiney, ¶ 35 (Leaphart, J. dissenting). The jury likely simply determined that Demontiney had committed all of the elements of deliberate homicide while acting under extreme mental or emotional stress. Demontiney, ¶ 35 (Leaphart, J. dissenting). The Court could not discern from the verdict form whether the jury first had acquitted Demontiney of deliberate homicide, or whether the jury first had convicted Demontiney of mitigated deliberate homicide. Demontiney, ¶ 35 (Leaphart, J. dissenting). The Court rejected this argument on the basis that the jury instructions incorrectly directed the jury to consider first the more serious deliberate homicide charge. Demontiney, ¶ 19.
*287 ¶34 The District Court did not commit the same error in this case. The court’s jury instruction on mitigated deliberate homicide directed the jury to consider whether Schmidt had committed all of the elements of deliberate homicide while acting under the influence of extreme mental or emotional stress. If the jury found that Schmidt had committed all of the elements of deliberate homicide without the mitigating circumstance of extreme mental or emotional stress, it was to find Schmidt guilty of deliberate homicide. The court’s instruction differed functionally from Schmidt’s in that it omitted the concluding direction first to consider the verdict on the greater offense, and to consider mitigated deliberate homicide only if it were unable to reach a verdict on deliberate homicide. Schmidt’s proposed instruction erroneously would have directed the jury first to consider the deliberate homicide charge. Schmidt’s proposed instruction further would have directed the jury to consider mitigated deliberate homicide only if the jury were unable to reach a verdict on deliberate homicide. Schmidt’s proposed instruction thus created precisely the type of issue that this Court addressed in Demontiney. The District Court avoided this potential pitfall by formulating its own instruction.
¶35 The District Court’s correct instruction must be distinguished from the verdict form proposed by Schmidt and adopted by the court. Unlike the District Court’s jury instruction, the verdict form directed the jury to enter a verdict for mitigated deliberate homicide only if it first found Schmidt not guilty of deliberate homicide. Schmidt’s challenge thus arises solely from the form on which the jury entered its verdict. The verdict form instructed the jury to skip the charge of mitigated deliberate homicide if the jury entered a verdict of “guilty” to the charge of deliberate homicide. If the jury entered a verdict of “not guilty” to deliberate homicide, however, the verdict form directed the jury to enter a verdict for the charge of mitigated deliberate homicide. The verdict form was functionally the same as the form offered by Schmidt.
¶36 Schmidt failed to object to the verdict form. Indeed, Schmidt argued at sentencing that the jury’s verdict provided “credibility” to the evidence of mitigation. Schmidt first objected to the alleged inconsistency in the verdict form when he filed his petition for a writ of supervisory control four months after he had filed his notice of appeal. Schmidt cannot create error for his own benefit on appeal. Cline v. Durden, 246 Mont. 154, 162, 802 P.2d 1077, 1082 (1990).
¶37 This Court in Demontiney stated that “[w]e cannot imagine a much more prejudicial result to a defendant than a guilty verdict that *288 is not logically possible.” Demontiney, ¶ 21. The same does not hold true here. The court correctly instructed the jury on mitigated deliberate homicide in spite of Schmidt’s proposed erroneous instruction. We must presume that the jury followed the court’s instruction. Malcolm v. Evenflo Co., 2009 MT 285, ¶ 103, 352 Mont. 325, 217 P.3d 514.
¶38 Schmidt now attempts to create a Demontiney issue from the verdict form that he proposed. As noted by Justice Leaphart in Demontiney, we cannot discern definitively whether the jury first acquitted Schmidt of deliberate homicide, or first convicted Schmidt of mitigated deliberate homicide. Demontiney, ¶ 35 (Leaphart, J. dissenting). The Dissent, in rejecting this conclusion, conflates the District Court’s jury instruction with the directions on the verdict form. In Demontiney, both the verdict form and the jury instructions directed the jury to consider mitigated deliberate homicide only if it first acquitted the defendant, or was unable to reach a verdict of deliberate homicide. The Dissent ignores the functional difference here by focusing on the erroneous verdict form rather than the fact that, unlike in Demontiney, the District Court correctly instructed the jury. This Court in Demontiney was concerned primarily with “the District Court’s erroneous instructions, not with the jury’s efforts to grapple with those erroneous instructions.” Demontiney, ¶ 19. The District Court in this case correctly instructed the jury to consider mitigating circumstances concurrently with the elements of deliberate homicide. We must assume that the jury followed those instructions. Evenflo, ¶ 103. This assumption holds true here, where Schmidt provided the erroneous verdict form, but the court actually instructed the jury correctly. We have no basis from which to determine that the jury followed the directions on the verdict form to the exclusion of the instruction provided by the District Court.
¶39 The Dissent further contends that the legislature has confused the state of the law with regard to the crime of mitigated deliberate homicide. The Dissent raises valid concerns, but it is not this Court’s job to write the law - rather we must apply it as written. We note nonetheless that the verdict form suggested by the Dissent would obviate Demontiney-type problems pending a legislative fix.
¶40 We further recognize that Schmidt proposed a verdict form that contained functionally the same wording as the one he now claims resulted in a “legal impossibility.” Schmidt may not now claim prejudice from that form that he proposed. Cline, 246 Mont. at 162, 802 P.2d at 1082. The Court in Demontiney presumed prejudice from *289 the ambiguous verdict form due to the erroneous jury instructions. Demontiney, ¶ 19. We decline to presume prejudice from this verdict form in light of the fact that the District Court correctly instructed the jury. We cannot determine under these circumstances that the verdict form presented by Schmidt, and adopted by the court, substantially prejudiced Schmidt. State v. Scarborough, 2000 MT 301, ¶ 85, 302 Mont. 350, 14 P.3d 1202.
¶41 Did the District Court properly deny Schmidt’s request for a lesser included offense instruction?
¶42 Schmidt argues that the District Court improperly refused his proposed jury instructions on assault with a weapon, aggravated assault, and criminal endangerment, as lesser included offenses of deliberate homicide. Schmidt cites State v. Castle, 285 Mont. 363, 948 P.2d 688 (1997), and State v. Sellner, 286 Mont. 397, 951 P.2d 996 (1997), for the proposition that assault represents a lesser included offense of deliberate homicide. A court must provide a lesser included offense instruction when one of the parties requests it and the jury rationally could find the defendant guilty of the lesser included offense. Castle, 285 Mont. at 369, 948 P.2d at 691; § 46-16-607(2), MCA.
¶43 The victim in Castle had been beaten severely before he was stabbed to death. Castle confessed that he had punched the victim three times in the jaw and once in the side of the head. Castle claimed, however, that the victim had been standing when he left the room. Castle returned to the room to find the victim on the floor. Castle claimed that he watched as another defendant stabbed the victim repeatedly. Castle, 285 Mont. at 366, 948 P.2d at 689.
¶44 This Court determined that Castle’s testimony and the medical evidence established a factual basis from which a jury rationally could have found Castle guilty of assault, rather than guilty of homicide. Castle’s theory posited that someone other than Castle had been responsible for the victim’s death. Castle, 285 Mont. at 370, 948 P.2d at 692. The Court concluded that the trial court should have given Castle’s proffered jury instruction on assault as a lesser included offense. Castle, 285 Mont. at 370, 948 P.2d at 692.
¶45 This Court in Sellner rejected the defendant’s argument that an instruction for aggravated assault should have been given where the defendant intentionally shot a police officer. Sellner, 286 Mont. at 399, 951 P.2d at 997. The officer had stopped Sellner’s car to question Sellner in connection with an assault Sellner allegedly had witnessed. The officer had been unaware that Sellner had not paid his federal income taxes for nearly twenty years, had no driver’s license, and as *290 a result had an aversion to law enforcement officers. Sellner jumped out of the car and fled. The officer shouted for Sellner to stop. Sellner instead shot the officer in the chest. The officer survived his injuries only because he had been wearing a bulletproof vest. Sellner, 286 Mont. at 399, 951 P.2d at 997.
¶46 Sellner argued that his trial counsel should have requested a jury instruction on aggravated assault as a lesser included offense of attempted deliberate homicide. Sellner, 286 Mont. at 398, 951 P.2d at 996. This Court distinguished Castle. The evidence presented in Castle raised the possibility that injuries inflicted by persons other than the defendant had caused the victim’s death. Castle, 285 Mont. at 370, 948 P.2d at 692. The Court emphasized that Sellner admitted to being the sole cause of the victim’s injuries. Sellner, 286 Mont. at 402, 951 P.2d at 999. The evidence in Sellner’s case did not support the giving of an aggravated assault instruction. Sellner, 286 Mont. at 403, 951 P.2d at 999.
¶47 Schmidt argues that the facts of his case fall somewhere in the middle of the spectrum delimited by Castle and Sellner. Schmidt maintains that a jury rationally could have found him guilty of the lesser included offense of aggravated assault. Schmidt concedes that no dispute exists that any person other than Schmidt caused Correia’s injuries. Schmidt admits to having inflicted the wounds that caused Correia’s death. Schmidt argues, however, that significant evidence supports his claim that he had not intended to cause Correia’s death. ¶48 Schmidt’s case falls squarely on the Sellner end of the spectrum. Schmidt relies on his own testimony and Correia’s allegedly threatening appearance and behavior to bolster the argument that Schmidt had not intended to kill Correia. The fact remains, however, that Schmidt, like Sellner, admits to having been the sole cause of the victim’s injuries. Schmidt admits that he stabbed Correia. Schmidt does not claim that anyone else was involved. Correia died from his injuries.
¶49 A person commits aggravated assault if they “purposely or knowingly [cause] serious bodily injury to another or purposely or knowingly, with the use of physical force or contact [cause] reasonable apprehension of serious bodily injury or death in another.” Section 45-5-202(1), MCA (emphasis added). By definition, aggravated assault does not include death. Once a death results, homicide is implicated. A jury properly instructed on the elements of aggravated assault rationally could not find Schmidt guilty of aggravated assault in light of the fact that Correia died from wounds inflicted solely by Schmidt. *291 The fact that aggravated assault constitutes a lesser included offense of deliberate homicide proves insufficient, by itself, to satisfy the statutory requirement for a lesser included offense instruction. A jury would not have been warranted in finding Schmidt guilty of aggravated assault based on the evidence presented. Section 46-16-607, MCA.
¶50 Did the District Court properly deny Schmidt’s motion to suppress evidence of his confession ?
¶51 Schmidt argues that he gave his confession and consent to a search in response to deficient Miranda warnings. Schmidt first attacks the notification of rights form used by the officers. Schmidt claims that the form’s wording implied that his right to counsel applied solely to judicial proceedings and did not extend to police interrogations. Schmidt next argues that the interviewing detective should have ascertained whether Schmidt understood his rights. Schmidt claims that the detective should have asked him explicitly whether he wished to be interviewed without counsel present. Finally, Schmidt maintains that the cursory manner in which the officer read the Miranda warnings failed to enable Schmidt to understand the consequences of waiving his rights. Schmidt claims that the sixteen seconds that it took the officer to read him his rights constituted “mere lip service” to Miranda.
¶52 Detective Edward “Butch” Harrington testified at trial that he gave Schmidt a copy of the notification form. Detective Harrington read Schmidt his rights before questioning him. The video of Schmidt’s interrogation depicts Detective Harrington reciting the Miranda warning to Schmidt in the presence of another officer. Detective Harrington summarized Schmidt’s rights, stating:
What I read ya, this breaks it down six ways (reading) ‘you have the absolute right to remain silent.’ If you read and if you can understand it and are comfortable with that, I’m just going to ask that you initial it. That’s all it is, is your rights. It’s not an admission or anything like that.
Schmidt examined the form, signed it, and handed it back to the detective. Schmidt specifically initialed six separate rights, including the right to have counsel present during questioning. Schmidt signed and dated the form.
¶53 The District Court twice viewed the recording of the interrogation. The court observed that the detectives had not used coercion or other improper investigative techniques. The detectives, on the contrary, were respectful, spoke in calm voices, and allowed Schmidt breaks *292 during the interview. The detectives did not make any promises to Schmidt in exchange for his statement. The District Court noted that although Detective Harrington’s recitation was brief, “[t]he recording depicts an adult suspect who appears to understand the nature and consequences of the interview process, including his waiver of rights.” Schmidt did not ask for counsel or assert his right to remain silent at any time during the interview.
¶54 The District Court also took into account Schmidt’s demeanor during questioning. The court determined that Schmidt’s ability to understand the officers’ questions and to formulate appropriate responses supported the notion that Schmidt understood and voluntarily had waived his rights. The court further noted that the officers had prefaced their request to search Schmidt’s house with a second and more extensive explanation of Schmidt’s rights. The District Court properly denied Schmidt’s motion to suppress.
¶55 Did the District Court properly deny Schmidt’s motion in limine to allow evidence that the victim had wielded a knife?
¶56 Schmidt challenges the District Court’s denial of his motion in limine to allow him to present testimony from a witness who claimed to have seen Correia with a knife in his hand earlier in the evening. Schmidt maintains that the testimony should have been admissible as evidence of Correia’s character. Schmidt did not seek to admit the evidence to show Correia’s reputation for violence. Schmidt focused instead on Correia’s prior conduct on the evening of the fight as having been relevant to demonstrate that the degree of force used by Schmidt had been reasonable.
¶57 Schmidt had not seen Correia holding the knife. The bouncer, Gunnar Fitzpatrick, was the only person to have seen Correia holding the knife. Correia complied when Fitzpatrick asked him to put away the knife. Schmidt never claimed that he had been aware that Correia had a knife before the fight. Whether Correia had brandished a knife earlier in the evening could have played no role, therefore, in Schmidt’s calculation as to the amount of force to use against Correia. The District Court did not abuse its discretion in determining that testimony regarding Correia having had a knife earlier in the evening was not relevant to Schmidt’s decision to use his own knife on Correia.
¶58 Did the District Court properly deny Schmidt’s request for a mistrial?
¶59 Schmidt argues that the District Court committed structural error when it denied Schmidt’s motion for a mistrial after a potential juror uttered a damaging comment about a defense witness. The State *293 inquired during jury selection whether anyone knew a certain defense witness. One of the potential jurors responded by blurting out that the witness had raped her daughter. The District Court reasoned that the witness in question was not on trial. The court further observed that the proposed defense witness could not be impeached by a conviction for rape as it did not pertain to the witness’s credibility.
¶60 The court reserved Schmidt’s right to follow up with individual voir dire if the panelist who had made the remark was in a position to be seated on the jury. The court also gave Schmidt leave to bring the motion again “should further voir dire establish some kind of a general bias on the panel based on that one comment.” Schmidt did not object to the District Court’s resolution of the matter. Counsel for Schmidt enquired during voir dire whether anything had been said “regarding any of the witnesses that are going to testify that would cause [any member of the jury] any concern or problem?” None of the witnesses mentioned the non-seated panelist’s remark. The court reserved Schmidt’s right to renew the motion for a mistrial if any evidence of bias surfaced at a later time. None did. The District Court did not abuse its discretion by denying Schmidt’s motion for a mistrial.
¶61 Did the District Court properly exclude a photograph of the victim offered by Schmidt?
¶62 The District Court denied Schmidt’s request to introduce a photograph of Correia that depicted Correia’s “intense” eyes. Schmidt argues that the District Court did not evaluate thoroughly the probative value of the photograph. Schmidt cites State v. Dunfee, 2005 MT 147, ¶ 26, 327 Mont. 335, 114 P.3d 217, for the proposition that a trial court must weigh the probative value of a photograph against its prejudicial effect to determine its admissibility. See also M. R. Evid. 403.
¶63 Our statement in Dunfee constitutes an application of Rule 403 to specific facts, rather than a general rule pertaining to photographic evidence. Courts apply the Rule 403 balancing test to determine whether relevant evidence should be excluded for reasons of prejudice. State v. Laird, 225 Mont. 306, 312, 732 P.2d 417, 421 (1987); M. R. Evid. 403. Schmidt’s argument skips the initial relevance determination.
¶64 The District Court determined that Schmidt had failed to make a sufficient showing that the photograph accurately reflected Correia’s appearance on the night of the fight. Schmidt also had introduced two other photographs of Correia. These photographs depicted Correia without his shirt, flexing his muscles. The admitted photographs also *294 showed Correia’s eyes. Schmidt’s counsel had questioned witnesses about Correia’s appearance generally, and Correia’s eyes in particular. The court observed that the photograph, in addition to being more than four years old, had not been taken in the bar or in Schmidt’s presence. The court’s determination that the photograph was not relevant precluded any need for it to proceed to the Rule 403 analysis. See Laird, 225 Mont. at 311, 732 P.2d at 421. The District Court did not abuse its discretion by denying its introduction. Damon, ¶ 12.
¶65 Did the District Court properly deny Schmidt’s motion for a directed verdict?
¶66 Schmidt claims that the District Court erred by denying his motion to dismiss at the close of the State’s case. A district court properly grants a motion for a directed verdict only when no evidence exists upon which a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt, when viewing the evidence in a light most favorable to the prosecution. Marler, ¶ 20.
¶67 The record contains ample evidence upon which the jury could have found that Schmidt had committed the elements of deliberate homicide. Marler, ¶ 20. The precise sequence of events on the night of Correia’s death remains elusive. Many of the witnesses had been drinking or were involved in the fighting at the Irish Times. It is undisputed, however, that Schmidt stabbed Correia and caused his death. Schmidt then fled the scene of the fight. Schmidt threw away his knife and cell phone, went home, and burned his clothes. Schmidt lied to police about the clothing that he had been wearing and the knife that he had used. The District Court properly allowed the jury to make the determination of whether the State had presented sufficient evidence to convict Schmidt. Marler, ¶ 35.
¶68 Did the District Court properly instruct the jury on weapons enhancement?
¶69 A court may impose a penalty enhancement once a jury makes a unanimous finding of guilt as to the underlying crime. The jury then must make a separate, unanimous finding, that the defendant committed the act that supports the enhancement. Section 46-1-401, MCA. The District Court instructed the jury on weapons enhancement in the context of deliberate homicide. The court did not instruct the jury separately on weapons enhancement with regard to mitigated deliberate homicide. Schmidt claims that the jury instruction became “the law of the case” under State v. Crawford, 2002 MT 117, 310 Mont. 18, 48 P.3d 706.
*295 ¶70 Crawford turned on a jury instruction that contained an extraneous element. The State’s failure to object to the proposed jury instruction rendered the instruction the law of the case. Crawford, ¶ 27. The jury became bound by the instruction. The court’s inclusion of this extraneous element in the jury instruction required the jury to find the extraneous element, in addition to finding all of the statutorily required elements. Crawford, ¶ 27.
¶71 The jury instruction that Schmidt challenges did not add or delete any elements of the underlying offense. The District Court considered this instruction in the context of all thirty-three jury instructions taken as a whole. State v. Dasen, 2007 MT 87, ¶ 34, 337 Mont. 74, 155 P.3d 1282. The jury instructions clearly stated that the charge of mitigated deliberate homicide required proof of all the same elements as deliberate homicide. The instructions also directed the jury to “consider all of the instructions as a whole, and ... to regard each in light of all the others.” The verdict form expressly directed the jury to answer the weapons enhancement inquiry if it found Schmidt guilty of mitigated deliberate homicide. The rule announced in Crawford has no application to these facts. The jury instructions, considered as a whole, fully and fairly instructed the jury on the applicable law. Dasen, ¶ 34.
¶72 Did the District Court properly impose restitution for the victim’s funeral expenses?
¶73 Schmidt challenges the District Court’s order that he pay restitution based on the failure of Correia’s family to submit an affidavit substantiating the amount of their pecuniary loss. Section 46-18-242(l)(b), MCA, requires a victim to submit an affidavit describing and assigning a dollar amount to the victim’s pecuniary loss. The trial court imposed restitution in the amount recommended by the probation officer in the pre-sentence investigation (PSI) report. The probation officer calculated restitution based on a written statement provided by Correia’s family.
¶74 The restitution included Correia’s funeral expenses and his family’s travel expenses during trial and sentencing. Schmidt did not specifically contest the amount of restitution. Schmidt did object to the lack of an affidavit in his sentencing memorandum. Schmidt offered no evidence or argument refuting the amount of restitution at the sentencing hearing. Schmidt did not claim that the restitution figure was unreasonable. Schmidt did not question the probation officer extensively. Schmidt did not insist on the need for an affidavit at the *296 hearing. Schmidt also did not make use of the hearing to question the members of Correia’s family who were present.
¶75 [7] We recently upheld the affidavit requirement of § 46-18-242, MCA, in State v. Hunt, 2009 MT 265, 352 Mont. 70, 214 P.3d 1234. The State’s failure to include an affidavit in the PSI report required remand to the district court for compliance with the statutory provisions. Hunt, ¶ 22. The defendant in Hunt objected at the sentencing hearing, however, to the lack of a sworn affidavit. Schmidt did not. Schmidt did not object to the amount, or calculation, of restitution at the sentencing hearing. Schmidt admitted in his sentencing memorandum and at the sentencing hearing that restitution was appropriate. Schmidt initially supported the PSI’s recommendation that he pay restitution in exchange for suspension of the weapons enhancement sentence. Schmidt objected only after he received an unfavorable sentence. The District Court’s imposition of restitution satisfies § 46-18-242, MCA.
¶76 Affirmed.
CHIEF JUSTICE McGRATH, JUSTICES WARNER, LEAPHART and RICE concur.