DA 09-0189

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2010 MT 136

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

HEATHER MICHELLE HENSON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DC-08-64
Honorable Michael C. Prezeau, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Joslyn Hunt, Chief Appellate Defender; Koan Mercer, Assistant
          Appellate Defender, Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General; John Paulson,
          Assistant Attorney General, Helena, Montana

          Bernie Cassidy, Lincoln County Attorney; Robert Slomski, Deputy
          County Attorney, Libby, Montana

          Kathleen Jenks, Assistant Attorney General, Special Deputy County
          Attorney for Lincoln County, Montana

          Submitted on Briefs:  April 8, 2010

                  Decided:  June 22, 2010

Filed:

                      Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Heather Michelle Henson appeals from her December 17, 2008 conviction of attempted mitigated deliberate homicide.  We affirm.

¶2     Henson presents the following issues for review:

¶3     Issue 1:  Whether the District Court erred by excluding evidence of the victim's prior acts.

¶4     Issue 2:  Whether the District Court erred by excluding testimony from Henson's proposed expert.

¶5     Issue 3:  Whether the District Court properly instructed the jury concerning the defense of justifiable use of force.

### BACKGROUND

¶6     Henson met the victim Larry Kingsley on July 8, 2008, as she was hitchhiking to Kalispell from Noxon.  They met in a bar south of Libby and Kingsley offered her a ride into Kalispell.  At the time Kingsley was age 67 and had been living in a camp trailer in various public campgrounds in northwestern Montana. Henson was age 19.

¶7     Henson told Kingsley she wanted to be a writer and a model, and he offered to help by giving her $2,300 in cash so she could buy a camera and a computer.  He also gave her some marijuana and hydrocodone.  In Kalispell, Kingsley got a motel room for himself and took Henson to the house of her uncle Noah Powell where she had been living with her boyfriend Stephen Thomas.  Henson showed the money and drugs to Powell and Thomas, and Powell advised her to go back to Kingsley and get more.  She

2

left the money in Powell's room overnight, and the next morning Powell and the money were gone.

¶8 Henson and Thomas then went to Kingsley's motel where Henson introduced Thomas as her brother. Kingsley took them to lunch and then they went shopping. Henson told Kingsley about losing the money and he said they would figure out some way for her to repay him. Kingsley bought Henson clothing, CDs, movies, a CD player, a computer and other items, paying cash. They also visited an adult store where Henson got several lingerie outfits, including one with an Army theme because Kingsley told them he had been a Navy SEAL.

¶9 Kingsley, Henson and Thomas then traveled to Kingsley's campsite at Sylvan Lake, located in a remote area 30 miles from Libby, Montana. Henson modeled the outfits from the adult store and after drinking a variety of alcoholic beverages she and Thomas had sex in the trailer while Kingsley watched. Kingsley then had intercourse with Henson.

¶10 Meanwhile, Powell told Henson and Thomas to move out of his house, so they went there to retrieve their belongings and took them to Kingsley's trailer at the campground. Kingsley kept a number of firearms at the camp including assault-style rifles and a pistol. The group would fire the guns into the air in what Kingsley said was a salute to his fallen comrades. Despite the fact that Henson fended off Kingsley's suggestions that she again have sex with him, she and Thomas stayed at Kingsley's camp for several days. They drank, shot guns and negotiated about whether Henson would have sex with Kingsley. Kingsley menaced Thomas and others in the campground with

his knife and guns, driving other campers out of the area with his threatening behavior. Kingsley eventually told Thomas he would have to choose between Henson, or drugs and money, because he wanted Henson for himself. Kingsley arranged for Thomas and Henson to have sex on a bear rug in the trailer "one last time" before she became Kingsley's.

¶11 On July 12 Kingsley again menaced Thomas with his knife and urged Henson to have sex with him. She became angry and Kingsley apologized and gave her a ring he had been wearing. The three then drove to Libby where Henson met her younger brother. Kingsley's behavior in one of the stores they visited was so disturbing that a patron called police and would not leave the store until they arrived. Henson then left with her brother to attend a magic show while Thomas stayed with Kingsley.

¶12 Kingsley and Thomas were stopped by police officers who questioned them about Kingsley's guns. Thomas said nothing about needing to get away from Kingsley or about fearing him. Kingsley dropped Thomas off at the magic show and drove by himself back to the campsite. The same officers who stopped Kingsley later saw Henson, Thomas and Henson's brother walking down the street in Libby. The officers talked to them and discussed their situation with Kingsley.

¶13 Later, Henson tried to call one of the officers to get a ride back to Kingsley's camp to retrieve their belongings. She could not connect with the officer, who was responding to a fatal traffic accident. Henson and Thomas decided to hitchhike back to Kingsley's campsite and got a ride from a man named Goodrich. They told him they had been staying with Kingsley and needed help to get their possessions and get out.

4

¶14 At the campground they met Kingsley driving out, and he turned around and came back in. After firing a shot overhead, Kingsley offered Goodrich a glass of whiskey that they drank while Henson fixed supper. Kingsley showed off his guns and drank from a jug of whiskey. He told Thomas to shoot the campground outhouse with a shotgun and when Thomas hesitated, Kingsley put a knife to his throat, backed him against a tree and told him to do as ordered.

¶15 Goodrich asked Kingsley if he could take Henson and Thomas to Kalispell and Kingsley said he could not let that happen because he was "the master." Kingsley asked Henson to perform a sex act on Goodrich but she refused. Goodrich told Kingsley he was a sick man and that he was going to leave. Goodrich drove away as Kingsley poked at his tires with the knife.

¶16 Kingsley sat by the fire and continued to drink. Henson and Thomas texted each other about what to do, and Henson said she thought they would have to shoot Kingsley to get away. Both Henson and Thomas were armed with rifles that they fired in the air for another of Kingsley's fallen comrade salutes. Henson's rifle jammed and she switched guns with Thomas. As he worked to clear the jam Henson turned and started firing at Kingsley as he sat in the chair with his eyes closed. Her first two shots missed but the third connected and brought Kingsley out of his chair. When Thomas saw Kingsley rise he started firing as well. Both Henson and Thomas emptied their rifles into Kingsley and then Henson emptied the pistol into his body as well.

¶17 They covered Kingsley with a tarp, placed the pistol in his hand and drove his truck to Kalispell. They parked the truck at Powell's house and he called police who arrested Henson and Thomas.

¶18 On August 1, 2008, the State charged Henson with deliberate homicide, evidence tampering by accountability and theft. The charge was later amended to include an alternative charge of attempted deliberate homicide.[1] Henson gave notice of affirmative defenses of justifiable use of force and compulsion. Henson's jury trial commenced on December 8, 2008 and concluded on December 17. The jury returned a verdict of guilty of attempted mitigated deliberate homicide, and not guilty of tampering and theft. On January 28, 2009 the District Court sentenced Henson to a term of 20 years with 15 suspended.

## STANDARD OF REVIEW

¶19 A district court has broad discretion in determining the relevance and admissibility of evidence. *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 225 P.3d 1229. This Court reviews evidentiary rulings for abuse of discretion, which occurs if the district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Id*. We review de novo district court rulings based on interpretation of an evidentiary rule or statute. *Id*.

¶20 A district court has "considerable latitude" to determine the admissibility of proposed expert testimony, and its decision will be overturned only upon a showing of abuse of discretion. *State v. Harris*, 2008 MT 213, ¶ 6, 344 Mont. 208, 186 P.3d 1263.

---

[1] Thomas was charged with similar offenses and was acquitted in a separate trial.

6

¶21 This Court reviews jury instructions to determine whether the instructions as a whole fully and fairly instruct on the applicable law. *State v. Schmidt*, 2009 MT 450, ¶ 26, 354 Mont. 280, 224 P.3d 618. A district court's broad discretion in formulating instructions is reversible only if the instructions prejudicially affect the defendant's substantial rights. *Id*.

## DISCUSSION

¶22 Issue 1: Whether the District Court erred by excluding evidence of the victim's prior acts. Henson sought to introduce evidence that during the month before his death Kingsley had interacted in aggressive and inappropriate ways with campers and others, and particularly that he accosted younger females by talking and acting in a sexually suggestive manner. One of the incidents involved an armed confrontation with another man at a campground that caused the other man to believe that he might have to shoot Kingsley in self defense. None of these incidents involved Henson or Thomas and Henson did not know about them until after Kingsley's death. The District Court granted the State's motion to exclude the evidence.

¶23 Henson's contended that the evidence was admissible under M. R. Evid. 404(a)(2) as evidence of a pertinent character trait of the victim. In addition, M. R. Evid. 405(b) provides that where a character trait of a person is an essential element of a defense or where it relates to the reasonableness of the force used in self defense, then specific instances of the person's conduct may be introduced. Since Kingsley's prior acts constituted other crimes, wrongs or acts under M. R. Evid. 404(b), the District Court examined whether any of the permissible purposes—motive, opportunity, intent,

7

preparation, plan, knowledge, identity or absence of mistake or accident—supported introduction of the evidence.

¶24 Henson argued that the evidence showed that Kingsley's motive was to obtain what he wanted—which was Henson as a sexual partner—by "threats and coercion, and if need be, violence." The District Court concluded that while the incidents showed that Kingsley acted in a crude, inappropriate, offensive, frightening and even threatening way, they did not demonstrate that he ever "obtained what he wished by threats and coercion, and if need be, violence. There is simply no evidence that during the course of any of these prior incidents, Kingsley ever 'obtained what he wished' or that he attempted to do so by threats, coercion, or violence."

¶25 The District Court then examined Henson's proffered evidence under the modified *Just* rule, *State v. Clifford*, 2005 MT 219, ¶¶ 46-47, 328 Mont. 300, 121 P.3d 489. The District Court's conclusion was that the other incidents were not sufficiently similar to the events that led to Kingsley's death and that in any event the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and the danger of misleading the jury. As the District Court stated, the evidence of the other incidents that did not involve Henson and that she did not even know about at the time of the shooting, could cause the jury to "conclude that Kingsley was a bad man who deserved to die."

¶26 The District Court also considered Henson's argument that the transaction rule, § 26-1-103, MCA, supported introduction of the evidence of the other incidents. None of the incidents was inextricably linked to, and explanatory of, the charged offense, which is

8

required for evidence to be admissible under the transaction rule. *State v. Stout*, 2010 MT 137, __ Mont. __, __ P.3d __; *State v. Guill*, 2010 MT 69, 355 Mont. 490, 228 P.3d 1152. The issue in the case was whether Henson's fear of Kingsley was justified and whether her response was reasonable. Henson was allowed to present evidence of Kingsley's behavior that she knew about before his death. However, the reactions of other persons to Kingsley in different situations were not relevant to Henson's defense. *State v. Lacey*, 2010 MT 6, 355 Mont. 31, 224 P.3d 1247 (when defendant was charged with sexual intercourse without consent, evidence of defendant's sexual misconduct with others was not admissible under the transaction rule).

¶27   Evidence of the character of a victim of an assault is limited to what the defendant knew at the time she used force, and the defendant must show that this knowledge led to the use of force. *Deschon v. State*, 2008 MT 380, ¶ 24, 347 Mont. 30, 197 P.3d 476; *City of Red Lodge v. Nelson*, 1999 MT 246, ¶ 19, 296 Mont. 190, 989 P.2d 300. Therefore, it was not an abuse of discretion for the District Court to grant the State's motion to exclude evidence of Kingsley's interactions with others.

¶28   Issue 2: Whether the District Court erred by excluding testimony from Henson's proposed expert. Henson did not assert as a defense that she was suffering from a mental disease or defect. Nonetheless, Henson's attorneys had her evaluated by psychiatrist Dr. William Startford. The evaluation took place on October 13 and 14, 2008, three months after Henson was charged and less than two months before the trial was set to begin December 8. Stratford's report was completed November 20 and it was provided to the State on November 21. The State moved to exclude Stratford's testimony. After the

December 1 hearing on pretrial motions the District Court granted the State's motion and excluded Stratford's testimony.

¶29 While the parties argue several issues concerning Stratford's report, a crucial consideration for the District Court was that it was not timely. Trial was set for December 8, and Henson, as was her right, had refused to waive her right to speedy trial. The District Court did not have another open trial date until the following March. Therefore, the State had barely two weeks, which included Thanksgiving, in which to find an expert, have that expert evaluate and test Henson, and develop testimony to rebut Stratford.

¶30 When a defendant puts her mental state into issue, the State is entitled to have the defendant examined by its own expert and to present rebuttal testimony. *State v. Hess*, 252 Mont. 205, 211, 828 P.2d 382, 386 (1992). When a defendant relies on mitigated deliberate homicide as a defense and intends to provide expert testimony on the issue, the State must be allowed "the opportunity to meet and test that proof." *Park v. District Court*, 1998 MT 164, ¶ 26, 289 Mont. 367, 961 P.2d 1267.

¶31 In this case the defense took over six months from the time the State filed charges to have Henson evaluated and to have the expert report prepared and served. The report was furnished to the State a scant two weeks before trial, and that two weeks included the Thanksgiving holiday. The District Court properly concluded that this did not give the State a reasonable time to prepare to rebut Stratford's testimony. The District Court therefore properly exercised its discretion and concluded that Stratford's testimony should be excluded because it was not disclosed in a timely manner.

¶32 Moreover, Henson argued at trial that Stratford's testimony was crucial to establishing whether she had acted under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse, so as to establish mitigated deliberate homicide rather than deliberate homicide. The jury convicted her of attempted mitigated deliberate homicide, and not deliberate homicide. Compare § 45-5-103 with § 45-5-102, MCA. Therefore, Henson suffered no prejudice in this regard from the exclusion of Stratford's testimony.[2]

¶33 Issue 3: Whether the District Court properly instructed the jury concerning the defense of justifiable use of force. Justifiable use of force is an affirmative defense, § 43-3-115, MCA, and it requires that the defendant produce sufficient evidence to raise a reasonable doubt of her guilt. *State v. Longstreth*, 1999 MT 204, ¶ 22, 295 Mont. 457, 984 P.2d 157. When a defendant raises justifiable use of force as a defense, it is "properly and constitutionally" her burden at trial to support the defense by producing sufficient evidence to raise a reasonable doubt of guilt. *State v. Matz*, 2006 MT 348, ¶ 17, 335 Mont. 201, 150 P.3d 367. At the same time the State has the burden to prove all the elements of the charged offense beyond a reasonable doubt, but it does not have to prove the absence of justification. *Longstreth*, ¶ 22; *Matz*, ¶ 17.

¶34 Henson objects to two instructions given by the District Court. Instruction 22 provided:

Justifiable Use of Force as a Defense

---

[2] The District Court expressly considered the Stratford report during sentencing.

The defense of justifiable use of force is an affirmative defense and the defendant has the burden of producing sufficient evidence on the issue to raise a reasonable doubt of her guilt.

If the defendant was justified in the use of force, you must find her not guilty.

Instruction 23, taken from the Montana Criminal Jury Instructions, Instruction 3-110, provided:

Issues—Justifiable Use of Force as a Defense

The defendant has pleaded justification in the use of force in this case. As such, the defendant has the burden of producing sufficient evidence of justification in the use of force to raise a reasonable doubt of guilt. You are to consider the following requirements of the law in determining whether the use of force claimed by defendant was justified:

1. The defendant must not be the aggressor;

2. The danger of harm to the defendant or Stephan Thomas must be a present one and not threatened at a future time and not made by a person without the present ability to carry out the threat;

3. The force threatened against the defendant or Stephan Thomas must be unlawful;

4. The defendant must actually believe that the danger exists, that is, use of force is necessary to avert the danger and that the kind and amount of force which defendant uses is necessary;

5. The defendant's belief, in each of the aspects described, is reasonable even if it is mistaken;

6. Defendant is justified in the use of force which is intended or likely to cause death or serious bodily harm only if she reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to herself or another or to prevent the commission of a forcible felony.

You are further instructed that even if you determine the use of force by defendant was not justified, the State still has the duty to prove each of the elements of the crime charged beyond a reasonable doubt.

Henson contends that these instructions improperly "implied application of a preponderance standard to the justifiable use of force issue."

¶35 As to instruction 22, Henson argued at trial that the second sentence should have instructed the jury that "if you are not convinced beyond a reasonable doubt that she was

12

not justified in the use of force, you must find her not guilty." The District Court was concerned that the multiple negatives in Henson's proposed language would be confusing.

¶36 We approved use of the language of Instruction 22 in *State v. Archambault*, 2007 MT 26, ¶ 22, 336 Mont. 6, 152 P.3d 698, and the language of Instruction 23 in *Longstreth*. We find no reason to reach a different result here. Henson had the burden, by raising the affirmative defense, to produce sufficient evidence to raise a reasonable doubt as to her guilt. *Matz*, ¶ 17. Nothing in the given instructions imposed any improper burden of proof on Henson.

¶37 The instructions properly described the affirmative defense and properly placed the burden on the State to prove all elements of the offense beyond a reasonable doubt. Further, the jury was directed in several other instructions that the State had the burden to prove the elements of the offenses beyond a reasonable doubt; that Henson had the benefit of a presumption of innocence that could only be overcome by proof beyond a reasonable doubt; and that Henson was not required to prove her innocence or to present any evidence. The disputed instructions did not alter the law and did not expressly or impliedly place any improper burden on Henson. The instructions as a whole properly instructed the jury and the District Court did not abuse its discretion.

¶38 Henson's conviction is affirmed.

/S/ MIKE McGRATH

13

We concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART

Justice Jim Rice, concurring.

¶39     I concur with the Court's resolution of all issues.  Under Issue 1, I disagree with the Court's statement in ¶ 26 that "[n]one of the incidents was inextricably linked to, and explanatory of, the charged offense."  The incidents here were similar to the pre-crime incidents we affirmed under the transaction rule in *State v. Mackrill*, 2008 MT 297, 345 Mont. 469, 191 P.3d 451, and *State v. McCaslin*, 2004 MT 212, 322 Mont. 350, 96 P.3d 722.  However, under the trial issues presented here, I agree that the District Court acted within its discretion in determining to exclude the evidence.

/S/ JIM RICE