No.   91-005

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

STATE OF MONTANA,

     Plaintiff and Respondent,

-vs-

CLARA M. HESS,

     Defendant and Appellant.

FILED

MAR 10 1992

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Sixth Judicial District,
In and for the County of Park,
The Honorable Byron L. Robb, Judge presiding.


COUNSEL OF RECORD:

     For Appellant:

          Charles F. Moses argued, Attorney at Law, Billings, Montana.

     For Respondent:

          Hon.   Marc   Racicot,   Attorney   General,   Helena, Montana; Jennifer Anders argued, Assistant Attorney General,   Helena,   Montana;   John   P.   Connor, Assistant   Attorney   General,   Helena,   Montana; William Nels Swandal, County Attorney, Livingston, Montana.


Submitted:   November 6, 1991

Decided:   March 10, 1992

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Clara Hess (Clara) appeals her conviction for the mitigated deliberate homicide of her husband, William "Bill" Hess, following a jury trial in the Sixth Judicial District, Park County. We affirm. We rephrase the issues presented on appeal as follows:

1. Did the District Court err in requiring the defendant to submit to a psychiatric and psychological evaluation by the State's expert witnesses for use by the State in rebuttal?

2. Did the District Court err by giving inappropriate jury instructions?

Clara married William "Bill" Hess (Bill) in 1947. Years later, Bill initiated divorce proceedings; the couple divorced in 1964. After their divorce, the couple continued to live together. In 1972, the couple remarried. Clara testified that in June 1989, the two agreed to part, but neither party initiated legal proceedings.

During the years she lived with Bill, Clara testified that Bill was tempestuous and subjected her to physical, sexual, and verbal abuse. She testified that Bill threatened her with a gun on three occasions. She testified that Bill oftentimes controlled her freedom. She also testified, however, that she frequently traveled without Bill to Washington and stayed with family and friends, sometimes for several weeks at a time. She testified that she also made other trips without Bill, including trips to Canada, Ohio and

Disneyland.  She further testified that she managed the checkbook and household finances of the couple, and had access to money from her mother's estate.

Some witness testimony supported Clara's depiction of Bill as abusive, controlling, and hot-tempered.  Other witness testimony depicted Bill as kind-hearted and gentle, and depicted Clara as the dominant and oftentimes absent person in the marriage.

Clara testified that in September 1988, she sought medical attention for a leg injury resulting from Bill's physical abuse. Medical records indicate that Clara told a treating doctor that her leg injury was a result of a "burning membrane" that started after riding in a car and was aggravated after another car trip.

Both Bill and Clara enjoyed hunting.  Clara testified that she engaged in target-shooting.  Both owned and were accustomed to shooting various handguns and rifles.  Clara kept a Beretta .22 pistol in a downstairs washroom and a .38 pistol in her bedroom. While traveling, she carried a loaded pistol in her purse.  Bill kept several guns in his bedroom, including a High Standard .22 pistol.

On the evening of August 19, 1989, Clara and Bill were home alone.  Clara testified that Bill said if she "didn't move back into his bedroom and do everything he wanted," he would tell Clara's then forty-four-year-old son about his true paternity. Clara testified that she responded to Bill's threat by sprinkling

3

sleeping pills in Bill's tapioca pudding. After eating his tapioca pudding, Bill went upstairs to his bedroom and retired.

Clara testified that on the morning of August 20, 1989, she entered Bill's bedroom and Bill threatened to kill her. She testified that she believes Bill moved toward the dresser to retrieve the High Standard .22 pistol. She testified that she recalls grabbing the pistol from the dresser, but does not recall struggling with Bill, firing the pistol, or dropping the pistol. She recalls leaving Bill's bedroom and going to her bedroom for an undetermined amount of time. A pathologist later testified that Bill died from two gunshot wounds to the left temple of his head. The pathologist could not determine whether Bill was standing or lying down when he received the wounds nor whether Bill was shot from close range. A firearm and toolmark examiner testified that 1) two spent cartridge cases taken from the scene were shot from Bill's High Standard .22 pistol, and 2) of the two bullet fragments taken from Bill's skull, one bullet fragment was from a .22 bullet and the other was probably from a .22 bullet. The Park County Sheriff testified that Bill's High Standard .22 pistol was later found in Clara's bedroom under her pillow.

When Clara returned to Bill's bedroom some time later, she recalls seeing Bill on the floor with "some dark stuff coming out of his mouth." She placed a pillow under his head and a blanket over him and did not realize he was dead until sometime that afternoon.

4

That evening, Clara wrapped Bill's body in the blanket that covered him and tied his body with a rope to a rubber raft. She then dragged Bill's body downstairs and outside to a deep hole meant for a root cellar. She testified that she first placed straw in this hole, then Bill's body, then the box spring and mattress from Bill's bedroom. She later testified that she also placed into this hole a blood-stained piece of carpet that she had removed from Bill's bedroom. The Park County Sheriff testified that this hole additionally contained a piece of carpet padding from Bill's bedroom, a spent .22 casing, and another rubber raft. Clara testified that she covered the contents of the hole with dirt.

The next morning on August 21, 1989, Clara telephoned Bill's sister, Sarah Leyde (Sarah) and told her that Bill was ill and that the Leyde family should not come over to their house that day to help side the garage as earlier planned. Later that day, Sarah telephoned Clara to check on Bill's health, and Clara told her that Bill was still ill.

On August 22, 1989, Clara purchased and had delivered ten yards of garden dirt from a local company. She then asked a neighbor who had access to a backhoe if he could use the backhoe to fill in the remainder of the hole with the garden dirt. Additionally that day, Clara went over to Sarah's house and told Sarah that Bill had gone fishing, but she did not know where. On August 23, 1989, the neighbor using his backhoe filled in the hole meant for a root cellar with the garden dirt.

Thereafter, Clara left Montana and traveled to Washington to visit family. On August 24, 1989, she telephoned Sarah from Washington and told her that Bill was fishing in Alaska. On August 29, 1989, Clara telephoned Sarah from Washington and told her that Bill was at a fishing camp in Williams Lake, British Columbia, and she was going to drive there to pick him up. On August 31, 1989, Clara telephoned Sarah and told her that Bill had died from a heart attack in Williams Lake, British Columbia, and his body had been cremated.

When Clara returned to her home in Montana, Sarah helped Clara pack Bill's belongings. Sarah became suspicious when Clara refused to allow anyone in Bill's locked bedroom because Clara claimed that Bill had killed a cat in his bedroom, leaving the floor stained. Sarah became more suspicious when she found Bill's glasses and fishing tackle in his car. Acting on these suspicions, Sarah telephoned authorities in Williams Lake, British Columbia, to confirm Bill's death and was told that there were no records of his death or cremation. Sarah then telephoned local police, which resulted in an investigation and the eventual excavation of Bill's body. Clara was later arrested in Washington.

On October 23, 1989, Clara was charged by information with deliberate homicide under § 45-5-102, MCA. At her arraignment hearing on October 24, 1989, she pled not guilty to this charge. On December 11, 1989, Clara gave notice of her intent to rely upon the affirmative defense of "use of justifiable force or self-

6

defense under the battered woman syndrome." This notice stated that Dr. Lenore Walker, a nationally known expert on battered woman syndrome, would examine Clara and testify at trial.

The State did not challenge Clara's reliance on the defense of justifiable use of force under battered woman syndrome, even though this defense has never been recognized in Montana. On January 12, 1990, however, the State gave notice of its intention to call Dr. Walters and Dr. Stratford, both experts on battered woman syndrome, to rebut the testimony of Dr. Walker. The State further moved and the District Court ordered, a psychiatric and psychological evaluation of Clara by Dr. Walters and Dr. Stratford at State expense.

Clara twice refused to participate in this court-ordered evaluation and requested a writ of supervisory control from this Court. On April 11, 1990, the District Court sanctioned Clara and ordered that if she refused to participate in this evaluation, Dr. Lenore Walker would not be allowed to testify at trial.

On May 10, 1990, this Court granted limited supervisory control to Clara, and vacated the District Court's April 11, 1990 order regarding Dr. Lenore Walker's testimony. However, on May 16, 1990, this Court granted rehearing and vacated its May 10, 1990 order. In July 1990, Clara submitted to the court-ordered evaluation.

At trial, Dr. Walker testified that in her expert opinion, Clara suffered from battered woman syndrome. In rebuttal, Dr.

Walters and Dr. Stratford testified that in their expert opinions, Clara exhibited some symptoms of post-traumatic stress disorder (battered woman syndrome category).

On August 30, 1990, a jury convicted Clara of mitigated deliberate homicide. On September 26, 1990, the District Court sentenced Clara to thirty years imprisonment for mitigated deliberate homicide and five years imprisonment for the use of a weapon in commission of an offense, fined her $15,000, and designated her a nondangerous offender for parole eligibility purposes. From this conviction, Clara appeals.

1. Did the District Court err in requiring the defendant to submit to a psychiatric and psychological evaluation by the State's expert witnesses for use by the State in rebuttal?

Clara challenges, on both constitutional and statutory grounds, the District Court's authority to compel an independent psychiatric and psychological evaluation by State-chosen experts for use during rebuttal.

A. Constitutional Grounds

Clara argues that the compelled evaluation violated her Fifth Amendment right protecting her against self-incrimination; she argues that she in no way waived this right. Clara argues that her Miranda rights were violated as she was never informed prior to the compelled evaluation that she had the right to remain silent. Clara argues that her Sixth Amendment right was violated as she did

8

not have counsel present during the compelled evaluation. Clara also argues that Smith v. McCormick (9th Cir. 1990), 914 F.2d 1153, is applicable to these facts as it supports the proposition that a compelled evaluation is prohibited constitutionally, as well as statutorily.

We agree with the State that Clara put her mental state at issue when she relied upon the affirmative defense of justifiable use of force and offered psychological evidence, the expert witness testimony of Dr. Lenore Walker, to support that defense. Accordingly, the State was entitled to have Clara examined by expert witnesses of its own choosing and to have these expert witnesses testify for the limited purpose of rebutting Dr. Lenore Walker's testimony. State v. Briand (N.H. 1988), 547 A.2d 235. See also, State v. Goodwin (1991), 249 Mont. 1, 813 P.2d 953. We therefore hold that Clara's Fifth Amendment right against self-incrimination was not violated.

We further agree with the State that Clara was not entitled to Miranda warnings prior to the compelled evaluation because 1) Clara was represented by counsel, 2) said counsel was fully informed of the time and place of the evaluation, 3) Clara was not in custody at the time of the evaluation, 4) as discussed, Clara placed her mental state at issue, and 5) the compelled evaluation was limited to use for rebuttal only. See McNeill v. Fulcomer (E.D. Pa. 1990), 753 F.Supp. 1294.

9

Clara next argues that under the Sixth Amendment, she was entitled to have her counsel present during the compelled evaluation. The record indicates that Dr. Walters, a psychologist, examined Clara on July 11 and 12, 1990. Clara's counsel was present in Dr. Walters' office at both sessions, although he was not in the examination room. The record further indicates that Dr. Stratford, a psychiatrist, examined Clara during two separate sessions in July 1990. Clara's counsel, although not present in the examination room, was present in Dr. Stratford's office during the first session and was apparently in contact with her by telephone during the second evaluation.

In the District Court's February 5, 1990 order relating to the State's motion for a compelled psychiatric and psychological evaluation by State experts, the court ordered:

> B. That in [the] event defendant chooses to submit to such evaluation . . . her attorney may attend and be present. . . . The state shall thereafter also promptly furnish defense counsel with a true copy of any report or reports prepared by Drs. Stratford and Walters.
>
> C. That such evaluation shall be made subject to defendant's constitutional and statutory rights not to make statements or produce documents that may incriminate her, that the state's counsel and witnesses may use such examination only for determining the mental condition of defendant and for rebuttal, and that all experts and counsel shall keep their records and reports confidential except as necessary for use in trial of this case.

From the record in this case, the only information elicited by Dr. Stratford and Dr. Walters in their examinations related to the mental condition of Clara and their testimony was used only to

10

rebut the testimony of Dr. Lenore Walker, Clara's expert witness. Accordingly, the testimony of Dr. Stratford and Dr. Walters stayed well within the parameters of the District Court's order.

Additionally, following a careful review of the entire record, we hold that this testimony did not prejudice Clara and therefore is not a ground for reversal. See § 46-20-701, MCA. Dr. Stratford testified during cross-examination that he was unable to reach a conclusion on whether Clara suffered from post-traumatic stress disorder. Dr. Walters testified during cross-examination: "I am confident saying that [Clara] reports a number of symptoms that are consistent with post-traumatic stress disorder." Although Dr. Walters did not conclude that Clara suffered from post-traumatic stress disorder, he testified during cross-examination that based on his limited test results of Clara, "[i]t appears likely" that she suffers from post-traumatic stress disorder. Accordingly, the testimony of Dr. Walters and Dr. Stratford did not prejudice Clara regarding her defense of battered woman syndrome.

Clara also argues that Smith v. McCormick (9th Cir. 1990), 914 F.2d 1153, is applicable to these facts as it supports the proposition that a compelled evaluation is prohibited constitutionally, as well as statutorily. We disagree that Smith stands for this proposition; if anything, the language of Smith supports the State's position that, as a matter of trial fairness, the State must be provided an opportunity to rebut the evidence offered by

11

the defendant's expert witness and that a compelled evaluation is proper:

> Consistent with the adversarial nature of the fact-finding process and the quasi-scientific nature of psychiatric opinion, the Ake court explicitly rejected the notion that psychiatrists can be expected to reach a unanimous diagnosis of the current mental condition of a defendant and unanimous prognosis as to future expected conduct or that there is such a thing as "neutral" psychiatric testimony:

> "Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party."

Smith, 914 F.2d at 1157 (citing Ake v. Oklahoma (1985), 470 U.S. 68, 81, 105 S.Ct. 1087, 1095, 84 L.Ed.2d 53, 64-65). We therefore hold that the Smith decision presents no basis for reversing this case.

### B. Statutory Grounds

Clara argues that Montana's statutory scheme does not provide the District Court the authority to compel a psychiatric and psychological evaluation of a defendant who asserts the affirmative defense of justifiable use of force based on battered woman syndrome under §§ 46-15-323, -324, -331, and -332, MCA (1989). Clara further argues that statutes governing the procedure for mental evaluation when mental state is an issue, §§ 46-14-101 to -

12

313, MCA (1989), are inapplicable here because the defense of justifiable use of force based on battered woman syndrome does not place a defendant's mental state at issue and these statutes do not expressly provide for battered woman syndrome.

We hold that §§ 46-15-323, -324, -331, and -332, MCA (1989), are inapplicable because, as previously discussed, Clara put her mental state at issue when she relied upon the defense of justifiable use of force based on battered woman syndrome and offered the testimony of Dr. Lenore Walker in support of that defense. The applicable statute, § 46-14-212, MCA (1989), authorizes the State to request a mental evaluation once the defendant's mental state is at issue. Furthermore, the District Court had authority to apply §§ 46-14-101 to -313, MCA (1989), without specific statutory reference to the defense of justifiable use of force based on battered woman syndrome. See State v. Briand (N.H. 1988), 547 A.2d 235, 237. We therefore hold that § 46-14-212, MCA (1989), provided the District Court the authority to compel Clara to undergo a psychiatric and psychological evaluation by expert witnesses chosen by the State for the limited purpose of rebuttal. We further hold that the District Court had the right to sanction Clara when she twice refused to cooperate with undergoing the court-ordered evaluation under § 46-15-329, MCA (1989).

2. Did the District Court err by giving inappropriate jury instructions?

13

Clara argues that the District Court erred when it refused her instructions on 1) presumption of innocence and 2) deliberation. Clara further argues that the District Court should have given instructions that the testimony of law officers should not be given special credibility and that the State bears the responsibility to disprove the theory of self-defense.

We hold that the District Court properly refused Clara's instructions on presumption of innocence and deliberation because they are repetitive, conflict with the instructions already approved by the District Court, and are redundant. Furthermore, the District Court was not bound to give jury instructions concerning the credibility of law officer testimony because these instructions were never offered at trial, and this Court has never held these instructions as necessary to avoid reversible error. We therefore hold that the District Court committed no error in refusing these jury instructions.

In conclusion, we affirm Clara Hess's conviction of the mitigated deliberate homicide of her husband, William "Bill" Hess.

_____
Chief Justice

14

We concur:

John Conway Harrison
_____

Karla M. Gray
_____

William E. Hunt Sr.
_____

Terry Trieweiler
_____

W. William Leaphart
_____

_____
Justices

March 10, 1992

CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Charles F. Moses
Moses Law Firm
P.O. Box 2533
Billings, MT 59103

Hon. Marc Racicot
Attorney General
John Connor, Jr. Asst. Atty. Gen.
Justice Bldg.
Helena, MT 59620

Wm. Nels Swandal
County Attorney
414 E. Callendar
Livingston, MT 59047

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
    Deputy