FILED

12/09/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0484

DA 22-0484

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 281

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

ANDREW JOHN SMITH,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Petroleum, Cause No. DC-2021-2
Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Colin M. Stephens (argued), Stephens Brooke, P.C., Missoula, Montana

       For Appellee:

       Austin Knudsen, Montana Attorney General, Roy Brown (argued), Assistant Attorney General, Helena, Montana

       Diane Cochran, Petroleum County Attorney, Thorin Geist, Special Deputy County Attorney, Lewistown, Montana

Argued: April 4, 2025
Submitted: April 8, 2025
Decided: December 9, 2025

Filed:

_____
Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1    Andrew John Smith appeals from a July 5, 2022 judgment of the Tenth Judicial District Court, sentencing Smith to a total of 110 years at Montana State Prison (MSP) after a jury verdict finding him guilty of Deliberate Homicide with a sentencing enhancement for use of dangerous weapon pursuant to §§ 45-5-102 and 46-18-221, MCA.  We affirm.

¶2    We restate the issues on appeal as follows:

*Issue One: Whether the District Court erred by precluding Smith from seeking a lesser-included offense of mitigated deliberate homicide because he was also asserting a complete defense based on justifiable use of force.*

*Issue Two: Whether failing to review the District Court's alleged error of responding to mid-trial questions from jurors without consulting the parties would result in a manifest miscarriage of justice.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    Around 7:15 p.m. on July 15, 2021, 29-year-old Smith went outside his apartment in the town of Winnett to smoke.  Shortly thereafter, Smith's then fiancée, Kymber, "heard a strange, like, popping or banging noise" that "sounded like a screen door shutting hard." A few minutes later, Kymber went outside to see what the noise was and saw Smith about five feet away from their 79-year-old neighbor, Larry Patterson, who was holding onto himself and stumbling around while "blood [was] spurting from him."  She saw blood trickling from Smith's arm and on his sweater, from what she assumed was a gunshot wound.  Smith had a knife in his hand.  He told Kymber that Patterson had shot him first. While Kymber called emergency services and tried to assist Patterson, Smith took off his sweater and went to the bar across the street to smoke.  Patterson died from his wounds.

2

¶4 Kymber's father, Kale, owned the bar. When Smith entered the bar, Kale said he could not enter without a shirt on. Kale noticed blood on Smith as he was leaving and followed him outside to ask what happened. Smith told Kale Patterson had just shot him. Kale noticed a gun about four feet away from Patterson. Kale made Smith drop his knife and sit away from it while they waited for law enforcement.

¶5 At trial, Smith testified he had approached Patterson and asked him for a match for his cigarette. Patterson ignored Smith. After standing there for 10 to 15 seconds without a response, Smith left to get rid of his cigarette. He then returned to confront Patterson, asking him what his problem was. Still sitting, Patterson continued to ignore Smith as Smith kept asking him what his problem was. According to Smith, Patterson finally stood up and pulled a pistol on him. Smith said he then pulled Patterson into a bear hug and pulled out his knife. After briefly separating, Smith testified Patterson shot him. Smith then "snapped," pulled him into another bear hug, and began stabbing him "until the gun left his hands."

¶6 The State investigation revealed physical evidence that contradicted Smith's narrative. First, the lack of blood on the victim's pants along with the excess amount of blood on his shirt indicated that he was not standing when stabbed or the blood would have also saturated his pants. Second, no blood was on the victim's shoes, indicating he was not standing during the altercation. Third, the presence of blood inside the victim's pocket where he kept his gun indicated he had already been bleeding when he reached in to grab it. Finally, the knife wound on the victim's neck was level. Given the height difference

between Smith and the victim, the wound is inconsistent with Smith's claim they were both standing during the altercation.

¶7 The State charged Smith with Deliberate Homicide. Smith informed the State he intended to rely on the affirmative defense of Justifiable Use of Force (JUOF), commonly referred to as self-defense. However, he did not reserve or even reference any intent to assert a mental disease or disorder defense at this time.

¶8 After a motion from the State, on September 16, 2021, the District Court issued an order setting a deadline for Smith to disclose all claims related to mental disease or disorder by October 25. On September 20, 2021, Smith filed a notice stating an examination had taken place, but the report could not be made until discovery was received and evaluated by the examiner. On October, 1, 2021, Smith identified Dr. Bowman Smelko on his Expert Witness List, stating "[h]e conducted [psychological] evaluation of the defendant."[1] Two weeks later, on October 15, the State provided the remaining discovery evidence. The October 25 deadline for Smith to disclose all mental disease or disorder claims passed without Smith having disclosed anything or providing any report from Dr. Smelko. Despite the missed deadline, the District Court set a new deadline requiring Smith to disclose mental disease or disorder claims by November 26, 2021. Smith missed this deadline as well.

---

[1] On the same list, Smith identified Eli Karinen as an expert witness, stating "[h]e was the Defendant's counselor prior to the . . . incident." Later on February 21, 2022, Smith also identified Nurse Practitioner Kimberlee Decker as a possible witness. Smith dropped Karinen and Decker from his witness list three days before trial on April 15, 2022.

4

¶9      On January 10, 2022, the District Court held a scheduling conference, where Smith indicated he did not believe he would raise the issue of mental health and he believed the evaluation was no longer necessary. However, Smith also informed the State and the court he would notify them if he decided to raise the issue.

¶10     Four days later, the State moved to have the defendant examined for his fitness to proceed pursuant to § 46-14-202, MCA (2021). The State's motion was granted, and Smith was admitted to Montana State Hospital (MSH) for evaluation on February 9, 2022. On March 9, 2022, after a request from Smith,[2] the District Court ordered that MSH evaluate Smith under § 46-14-101(1)(a)(ii)–(b), MCA, for: (1) the state of mind required as an element of the offense, and (2) the ability to appreciate the criminality of his behavior.

¶11     On February 23, 2022, the State filed a motion in limine which included: (1) a motion to preclude Smith from introducing "waived defenses," including a mental disease or disorder defense, and (2) a motion to preclude him from introducing mental disease or disorder evidence to support a lesser-included offense of mitigated deliberate homicide. At the motions hearing, although he previously claimed Dr. Smelko "conducted [psychological] evaluation of the defendant," Smith asserted Dr. Smelko's evaluation had not yet taken place. Despite Smith's missed deadlines and his alleged "misrepresentation that [Smith] had been evaluated by Dr. Smelko," in the interest of justice, the District Court

---

[2] It is worth noting Smith's counsel only requested the full evaluation after being prompted by the District Court and the State. On March, 9, 2022, the court held a status conference to discuss Smith's evaluation at MSH. The court asked the parties whether they believed a full evaluation should be requested. The State informed the court only the defendant could make such a request. The court then asked Smith's counsel whether he would like to make the request, to which Smith's counsel replied, "I would make that request."

denied the State's motion in part and allowed evidence from the MSH evaluation to support a mental disease or disorder defense on the condition that Smith file notice immediately upon receipt of the evaluation. Smith later abandoned any potential mental disease or disorder defense. The District Court also granted the State's motion to preclude Smith from using mental disease or disorder evidence to support a lesser included offense of mitigated deliberate homicide. Accordingly, Smith did not present any mental disease or disorder evidence at trial.

¶12 On April 12, 2022, the State gave notice to the District Court and Smith that the MSH evaluation was completed. On the same day, the State moved for an expedited hearing to discuss Smith's counsel's "apparent misrepresentation" that Dr. Smelko never examined Smith. The Court held a hearing on the issue on April 14, 2022. At the hearing, Smelko testified he "engaged in background history, mental status examination, . . . and [he] performed[, completed, and scored] a personality assessment inventory [of Smith.]" When asked if he had an opinion on whether Smith could form the requisite mental state at the time of the offense, Smelko stated "I did have an opinion . . . so I shared that directly verbally with the attorney at some point indicating my findings which then were not asked to be written up based on the results." Smith's attorney responded he did not claim Dr. Smelko never examined Smith, rather he chose to drop Dr. Smelko as a witness because he was no longer needed.

¶13 During trial, the District Court informed the parties outside the presence of the jury that it had received a strictly evidentiary question from a juror. The court stated it was not going to reveal the question as that may influence counsels' questioning going forward but

6

had told the bailiff to inform the juror it was an evidentiary question the judge could not answer. Smith did not object. Another evidentiary question was received from a different juror the next day. The judge responded in the same manner and informed the parties. Smith again had no objection.

¶14 Smith was convicted of Deliberate Homicide with an enhancement for use of a weapon. The District Court sentenced him to 110 years in the Montana State Prison. Smith appeals the court's order on the motion in limine and the District Court's handling of the questions from jurors.

**STANDARD OF REVIEW**

¶15 The authority to grant or deny a motion in limine rests in the inherent power of the district court to admit or exclude evidence to ensure a fair trial and will not be overturned absent an abuse of discretion. *State v. Hudon*, 2019 MT 31, ¶ 16, 394 Mont. 226, 434 P.3d 273. Where a district court's ruling is based on an interpretation of law, we review it de novo. *State v. Thomas*, 2020 MT 281, ¶ 13, 402 Mont. 62, 476 P.3d 26. We will not reverse a cause for error unless the record shows the error was prejudicial. *Hudon*, ¶ 29.

¶16 We generally do not address issues not objected to at the district court and raised for the first time on appeal. *State v. Akers*, 2017 MT 311, ¶ 12, 389 Mont. 531, 408 P.3d 142. We may exercise plain error review where a defendant's fundamental rights are invoked and failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceeding, or may compromise the integrity of the judicial process. *Akers*, ¶ 13. We invoke the plain error

doctrine sparingly, on a case-by-case basis, considering the totality of the circumstances of each case. *Akers*, ¶ 13.

## DISCUSSION

¶17    *Issue One: Whether the District Court erred by precluding Smith from seeking a lesser-included offense of mitigated deliberate homicide because he was also asserting a complete defense based on justifiable use of force.*

¶18    In *State v. German*, we stated: "[a] defendant's justifiable use of force defense precludes a lesser-included offense instruction because the defense essentially admits the elements of the charged offense, including mental state.  If proven, the defense requires an acquittal."  2001 MT 156, ¶ 20, 306 Mont. 92, 30 P.3d 360.  Relying on this quotation, the District Court precluded Smith from presenting mental disease or disorder evidence to support a lesser included offense of mitigated deliberate homicide.  The State maintains that the District Court's ruling was correct because Smith's JUOF defense, if believed, would require an acquittal.  Yet, Smith contends the District Court erred in making such a categorical finding.  When looking at this quotation alone, it seems to support the State's argument and the District Court's conclusion.  However, viewed in light of the procedural posture in *German* and considering this Court's precedent, we agree with Smith.

## 1. Defense Theories and Lesser Included Offenses

¶19    "It is a fundamental rule in this state that a criminal defendant is entitled to jury instructions that cover every issue or theory having support in the evidence."  *State v. Castle*, 285 Mont. 363, 366, 948 P.2d 688, 690 (1997).  Thus, a defendant is entitled to an instruction on a lesser offense if sufficient evidence exists in the record from which the jury could rationally find him guilty of the lesser, but not the greater, offense.  *State v.*

8

*Martin*, 2001 MT 83, ¶ 23, 305 Mont. 123, 23 P.3d 216 ("In order for the district court to instruct the jury on a lesser included offense, the record must contain evidence from which the jury could rationally find the defendant guilty of the lesser offense and acquit of the greater."); *State v. Freiburg*, 2018 MT 145, ¶¶ 18, 391 Mont 502, 419 P.3d 1234 ("[G]iven the way Freiburg tried the case, there was 'some basis from which a jury could rationally conclude that the defendant is guilty of the lesser, but not the greater offense,' and he was entitled to lesser-included instructions.") (quoting *Castle*, 285 Mont. at 369, 948 P.2d at 691); § 46-16-607(2), MCA ("A lesser included offense instruction must be given when there is a proper request by one of the parties and the jury, based on the evidence, could be warranted in finding the defendant guilty of a lesser included offense.").

¶20 Indeed, we have previously held "a lesser included offense instruction is not supported by the evidence where the defendant's evidence or theory, if believed, would require an acquittal." *State v. Martinez*, 1998 MT 265, ¶¶ 10, 15, 291 Mont. 265, 968 P.2d 705 (citing *State v. Schmalz*, 1998 MT 210, ¶ 23, 290 Mont. 420, 964 P.2d 763). Nevertheless, a defendant is entitled to present alternate (and sometimes conflicting or inconsistent) theories of his case. *State v. Craft*, 2023 MT 129, ¶ 16, 413 Mont. 1, 532 P.3d 461; *State v. Avidiya*, 2025 MT 31, ¶ 6 n.2, 420 Mont. 344, 563 P.3d 763 (citing *Freiburg*, ¶ 19). While these two principles seem to conflict, an overview of our prior caselaw reveals their consistency. Where a defendant's *only* evidence or theory requires an acquittal, then a lessor included offense is not supported by the evidence.

¶21 In *Martinez*, "Martinez was charged with felony assault . . . for purposely or knowingly causing reasonable apprehension of serious bodily injury by use of a weapon

9

when he pointed a handgun at Gillespie," who was the State's only witness supporting the charge. *Martinez*, ¶ 11. Martinez sought a lesser-included instruction on misdemeanor assault, however, his only theory supporting his case was that Gillespie was not a credible witness. *Martinez*, ¶¶ 12–13. Because Gillespie's testimony was the only evidence supporting a charge of assault, "there would have been no evidence at all" to support the lesser offense if the jury had discounted his testimony. *Martinez*, ¶ 15. In that event, discrediting Gillespie's testimony would require an acquittal on both offenses. *Martinez*, ¶ 15; *see also Martinez*, ¶¶ 16–20 (same for criminal endangerment and Martinez's proposed instruction on negligent endangerment); *Avidiya*, ¶ 15; *German*, ¶ 23 (no evidence supported negligent homicide instruction where defendant admitted to consciously shooting the victim); *State v. Shegrud*, 2014 MT 63, ¶¶ 13–18, 374 Mont. 192, 320 P.3d 455 (district court required to give lesser-included offense instruction where evidence could support either offense); *State v. Daniels*, 2017 MT 163, ¶ 16, 388 Mont. 89, 397 P.3d 460 (same).

¶22    In *Schmalz*, Schmalz was charged with attempted deliberate homicide and sought an instruction on felony assault because his mother testified she did not think he intended to shoot her. *Schmalz*, ¶ 20. This raised the question of whether he possessed the necessary state of mind for the crime. *Schmalz*, ¶ 23. We held the district court did not err in refusing to instruct on felony assault because if the jury credited the mother's testimony, the necessary intent for either crime would be lacking and would support an acquittal on both offenses. *Schmalz*, ¶ 23. We thus stated, "an instruction on a lesser included offense of assault has no support in the evidence and is not necessary when the defense's evidence, if

10

believed, would require an acquittal." *Schmalz*, ¶ 23 (citing *State v. Howell*, 1998 MT 20, ¶ 34, 287 Mont. 268, 954 P.2d 1102; *State v. Sellner*, 286 Mont. 397, 402, 951 P.2d 996, 999 (1997)).

¶23 In *Sellner*, Sellner argued counsel was ineffective for failing to offer a lesser-included instruction of aggravated assault on his charges of attempted deliberate homicide based on his testimony that a voice told him he would not harm the victim by shooting him in the chest because the victim was wearing a flak jacket. *Sellner*, 286 Mont. at 399, 402, 951 P.2d at 997, 999. Citing *Castle*, we discussed that an instruction on assault must be given only when there is a basis from which a jury could rationally conclude the defendant is guilty of the lesser, but not the greater, offense. *Sellner*, 286 Mont. at 401, 951 P.2d at 999. We held counsel was not ineffective. *Sellner*, 286 Mont. at 403, 951 P.2d at 999. If the jury believed Sellner's testimony, the evidence "would not have supported a conviction of aggravated assault—if anything, it would have supported an acquittal." *Sellner*, 286 Mont. at 402, 951 P.2d at 999. Thus, if the jury believed Sellner, he would be acquitted of both attempted deliberate homicide, which required a purpose to cause death, and aggravated assault, which required purposely or knowingly causing serious bodily injury. *Sellner*, 286 Mont. at 401, 951 P.2d at 998.

¶24 Likewise, in *Howell*, Howell's evidence he accidentally cut the victim, if believed, would have led to an acquittal of both attempted deliberate homicide and his proposed lesser-included instruction on assault because he would have had no purpose to kill or injure. *Howell*, ¶¶ 33–34; *see also State v. Grindheim*, 2004 MT 311, ¶ 41, 323 Mont. 519, 101 P.3d 267 (defendant's theory, if believed, would lead to acquittal, not finding of guilt

11

on a lesser-included offense); *State v. Jay*, 2013 MT 79, ¶ 44, 369 Mont. 332, 298 P.3d 396 (same).

¶25 We have already clarified this line of cases: "[A] lesser-included offense instruction is not supported by the evidence when the evidence, if believed, would require an acquittal *on both* the greater and lesser offense—that is, the defense's entire theory is that the defendant did not commit the crime." *Craft*, ¶ 15 (emphasis added); *see also Daniels*, ¶¶ 12, 16; *Freiburg*, ¶¶ 18–19; *State v. Dellar*, 2025 MT 111, ¶ 14, 422 Mont. 124, 569 P.3d 534; *see generally Martinez*; *Schmalz*; *Sellner*; *Howell*. If the defendant's theory and evidence would require acquittal on both the greater and lesser offense, the jury could not be warranted in finding the defendant guilty of the lesser-included offense. Otherwise, the lesser-included instruction might lead to troublesome verdicts where a jury has reasonable doubt based on the defendant's evidence yet decides to convict him of something without evidence to support it. *Cf. Castle*, 285 Mont. at 367, 948 P.2d at 690 (purpose of providing lesser-included offense instructions when evidence supports them is to prevent conviction of greater offense rather than acquittal when the jury is convinced the defendant is guilty of some crime); *State v. Brown*, 2022 MT 176, ¶ 15, 410 Mont. 38, 517 P.3d 177. Thus, if the defendant's proffered evidence must lead to acquittal on the greater and the lesser offense, there is no legal reason to give a lesser-included offense instruction.

¶26 Contrary to the State's assertion, there is no bright-line rule prohibiting a defendant from asserting alternative defense theories. *Craft*, ¶ 15 ("There is sufficient evidence for the jury to convict a defendant of the lesser offense when there are alternate theories of the

12

case, including a theory about the lesser-included offense, and other witness testimony—especially the defendant's testimony—supports that theory.") (citing *Freiburg*, ¶ 18). Our precedent shows a defendant must present evidence that would support both theories. A lesser-included instruction should be given if "the jury, based on the evidence, *could be warranted* in finding the defendant guilty of a lesser included offense." Section 46-16-607(2), MCA (emphasis added); *Castle*, 285 Mont. at 369, 948 P.2d at 691 ("[T]here must be some basis from which a jury could rationally conclude that the defendant is guilty of the lesser, *but not the greater* offense." (emphasis added)); *Freiburg*, ¶ 19 ("[W]hen a defendant presents an alternative theory, supported by evidence, which would, if believed, require acquittal of a higher charge, but nonetheless permit conviction on a lesser-included offense, then he satisfies the *Castle* test and is entitled to a lesser-included offense instruction."). This is evident from our holdings in *Freiburg* and *Craft*.

¶27 In *Freiburg*, the State charged Freiburg with Child Endangerment by DUI and "an alternative count of felony Child Endangerment by driving a motor vehicle with an alcohol concentration of 0.08 or more ("DUI *per se*")." *Freiburg*, ¶ 5. At trial, Freiburg challenged the charges based on the sufficiency of the field sobriety tests and the blood test. *Freiburg*, ¶ 6. He also argued he did not endanger the children in his car based on both the arresting officer's testimony that he "did not exhibit any signs of unsafe driving" other than accelerated starts on gravel and an adult passenger's testimony there was nothing about his driving to indicate his impairment. *Freiburg*, ¶ 6. "While setting jury instructions, Freiburg requested instructions on DUI and DUI *per se* as lesser-included offenses of

13

the . . . Child Endangerment charges," but the district court refused. *Freiburg*, ¶ 7. On appeal, we held the district court erred in refusing to instruct on the lesser included offenses although Freiburg presented alternative theories—one of which would have resulted in an acquittal of both charges—because he did not adopt an "all or nothing approach" on that theory and both theories were supported by evidence. *Freiburg*, ¶ 18. Ultimately, "there was 'some basis from which a jury could rationally conclude that the defendant is guilty of the lesser, but not the greater offense,' and he was entitled to lesser-included instructions." *Freiburg*, ¶ 18 (quoting *Castle*, 285 Mont. at 369, 948 P.2d at 691).

¶28 On the other hand, in *Craft*, Craft was charged with deliberate homicide, among other charges, for the murder of his roommate Adam Petzack. *Craft*, ¶ 3. At trial, Craft denied the State's allegations and blamed the murder on his wife, Katelyn. *Craft*, ¶ 5. However, after the State played a recording of Craft admitting he "snapped" and committed the murder, Craft requested a lesser-included offense of mitigated deliberate homicide. *Craft*, ¶ 5. "Craft adopted an 'all or nothing' approach at trial. His sole theory of the case—and all his evidence, arguments, and his own testimony to that effect—was that Katelyn killed Petzack while he was out of town." *Craft*, ¶ 16. Relying on the principle that the defendant's "evidence must provide 'some basis from which a jury could *rationally* conclude that the defendant is guilty of the lesser, but not the greater offense,'" we ultimately held the District Court properly denied Craft's request for the mitigated deliberate homicide instruction. *Craft*, ¶¶ 13, 16 (quoting *Freiburg*, ¶ 13).

¶29 Here, the District Court's pretrial ruling precluded Smith from offering the lesser-included offense of mitigated deliberate homicide if he relied on either JUOF or mental

14

disease or disorder as affirmative defenses because "either defense would result in an **acquittal**, which means that a lesser included instruction would be prohibited." (Emphasis in original.) Given our analysis of prior caselaw, the District Court erred.

*A. Whether JUOF is Mutually Exclusive with Lesser Included Offenses*

¶30    The State supports the District Court's ruling by quoting our analysis in *German*: "A defendant's justifiable use of force defense precludes a lesser-included offense instruction because the defense essentially admits the elements of the charged offense, including mental state." *German*, ¶ 20. "We have repeatedly recognized that a defendant who relies upon the defense of justifiable use of force concedes that he acted purposely and knowingly." *State v. Dulaney*, 2025 MT 67, ¶ 24, 421 Mont. 251, 566 P.3d 534 (quotations omitted). Yet, this rule knows some limitations. Notably, in *Dulaney*, we stated, "A defendant's concession that the 'use of force' was knowing and purposeful is not an admission that the defendant caused and had the requisite mental state to cause the result" of death to another human being, when he asserts JUOF while being tried for attempted deliberate homicide. *Dulaney*, ¶ 25. A JUOF defense concedes the "purposeful or knowing" mental state element for deliberate homicide but not the mental state for attempted deliberate homicide. "[I]t is possible for a defendant to concede acting purposely and knowingly as to the conduct, . . . but still deny that the conduct was intended as an act toward purposely or knowingly *causing* that person's death." *Dulaney*, ¶ 32 (emphasis added).

¶31    A JUOF defense precludes instructions for lesser-included offenses with elements contrary to the charged offense but does not preclude those with the same elements. For

15

example, negligent homicide requires the defendant to act *negligently* with respect to committing the crime, § 45-5-104(1), MCA, however, mitigated deliberate homicide maintains the same elements of the charged crime, including a mental state of "purposely or knowingly." *Compare* § 45-5-103(1), MCA (requiring a "purposely or knowingly" mental state) *with* § 45-5-102(1)(a), MCA (requiring a "purposely or knowingly" mental state). To concede the defendant acted "purposely or knowingly" is to concede he did not act "negligently." In other words, by conceding the defendant meets the elements of the greater crime, in turn, he concedes he did not meet inconsistent elements of the lesser offense. However, when the greater offense and the lesser require the same elements, using the JUOF defense does not have the same preclusive effect. This is evident, though not explicitly stated, in our holding in *German*.

¶32 In *German*, German was charged with one count of felony assault, one count of deliberate homicide under the felony murder rule, and one alternative count of deliberate homicide. *German*, ¶ 5. At trial, the District Court instructed the jury on German's JUOF defense and refused to instruct on negligent homicide but agreed to instruct on mitigated deliberate homicide. *German*, ¶ 7. On appeal, we affirmed the trial court's denial of the negligent homicide instruction, holding "a defendant's justifiable use of force defense precludes a lesser-included offense instruction because the defense essentially admits the elements of the charged offense, including mental state." *German*, ¶ 20. Yet, although mitigated deliberate homicide is also a lesser-included offense of deliberate homicide, the trial court rightly instructed the jury on it. *German*, ¶ 7.

16

## 2. Mitigated Deliberate Homicide

¶33 Mitigated deliberate homicide is unique among lesser-included offenses due to its structural similarity to an affirmative defense. Indeed, it was statutorily classified as an affirmative defense until the Legislature amended the statute, reclassifying it in 2003 as a lesser included offense of deliberate homicide. Section 45-5-103(3) MCA (2003 Mont. Laws ch. 22, § 1) (effectively abrogating in part *Howell*, ¶ 20 ("[M]itigated deliberate homicide is not a lesser included offense of deliberate homicide in the traditional sense, but rather is an affirmative defense that must be proven by the defendant by a preponderance of the evidence.") (citations omitted)). It is no longer an affirmative defense. Section 45-5-103(3), MCA ("Mitigating circumstances . . . are not an element of the reduced crime that the state is required to prove or an affirmative defense that the defendant is required to prove.").

¶34 While other lesser-included offenses, like negligent homicide, have at least one *different* element from the greater offense, mitigated deliberate homicide maintains the *same* elements. *Compare* § 45-5-103(1), MCA, ("A person commits the offense of mitigated deliberate homicide when the person purposely or knowingly causes the death of another human being.") *with* § 45-5-102(1), MCA ("A person commits the offense of deliberate homicide if: the person purposely or knowingly causes the death of another human being."). Yet, mitigated deliberate homicide requires an *extra* element: the defendant must have acted "under the influence of extreme mental or emotional stress for which there is [a] reasonable explanation or excuse." Section 45-5-103(1), MCA.

17

¶35 Unlike other lesser-included offenses, mitigated deliberate homicide is not inconsistent with arguing JUOF because they both assert the same elements. Moreover, a JUOF defense is not logically or legally inconsistent with the extra element of mitigated deliberate homicide. A defendant could hypothetically suffer from extreme mental or emotional stress while also being justified in his use of force.

¶36 Therefore, the State is incorrect. A JUOF defense does not preclude mitigated deliberate homicide as a lesser included offense, so long as there is evidence presented at trial to support it.[3] The court should have reserved its ruling until trial when the evidence would show whether Smith's theory of the case would require acquittal on both the greater and lesser offense or whether there was sufficient evidence to support giving both instructions.

¶37 Nevertheless, we will not reverse a cause for an error that was not prejudicial: "'[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.'" *Hudon*, ¶ 29 (quoting § 46-20-701, MCA); *see also* M. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . in case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."). We therefore consider whether the District Court's decision was prejudicial.

---

[3] The State apparently conceded this at oral argument, stating: "[Mitigated] is not necessarily inconsistent with JUOF in the circumstance. But we don't know that at the limine stage, right? So, I think that's a question more appropriate at the close of the evidence."

## 3. Evidence of Mitigation

¶38     Smith never made an offer of proof detailing the evidence he would seek to admit in support of mitigation.  Indeed, Smith had a difficult time at oral argument detailing what evidence exactly he would have sought to admit at trial had he been allowed.  Nor does Smith point to any admissible evidence or evidence he did not voluntarily withdraw which would have supported mitigated deliberate homicide.

¶39     During discussion on jury instructions, Smith proposed an instruction on mitigated deliberate homicide, "believ[ing] that the jury could find a lesser included offense here pursuant to the testimony that was given."  The court denied the proposed instruction, agreeing with the State there had not been any evidence of mitigation presented.  In his brief, Smith summarily asserts, without argument or citation, that he presented sufficient evidence through cross-examination and his own testimony to warrant the instruction.  The State responds Smith only takes issue with the court's denial of his motion in limine and not the court's denial of his proposed jury instructions.  Otherwise, Smith would have the burden of showing the instruction was supported by evidence offered at trial.  *See Craft*, ¶ 13.  Smith then admits in his reply brief that he only challenges the pretrial ruling—conceding he did not present sufficient evidence for the instruction to be warranted at trial. Smith also argues had he been able to present alternative theories, he could have "bootstrapped" mental disease or disorder evidence at trial to establish mitigated deliberate homicide.[4]   There are two problems with this theory.  First, Smith's mental health

---

[4] Smith conceded he could not assert both JUOF and mental disease or disorder as defenses as they are mutually exclusive, but maintains mental disease or disorder evidence may be admissible to

evaluation was inadmissible for the purpose of arguing mitigation, and it did not support his defense. Second, Smith did not admit or provide an offer of proof of any other evidence sufficient to warrant a mitigation instruction.

*A. Inadmissible Mental Health Records*

¶40 Smith identified Dr. Bowman Smelko as a mental health expert. Smelko evaluated Smith in July 2021. However, after receiving Smelko's evaluation results—and before the District Court's ruling on the State's motion in limine—Smith dropped Smelko as a potential witness and did not disclose Smelko's report to the State. One can safely assume Smelko's report was not helpful to Smith's theory of the case. Clearly, Smith did not intend to offer Smelko as a witness even without the District Court's order.

¶41 Similarly, Smith identified as potential witnesses both Eli Karinen, his counselor, as well as Nurse Practitioner Kimberlee Decker, both of whom had also seen Smith prior to the incident. However, Smith again decided to drop Karinen and Decker as witnesses before trial.

¶42 Still, there were additional mental evaluation records available. The District Court ordered MSH to conduct an evaluation for fitness to proceed and whether Smith had the requisite mental state to commit the offense, pursuant to § 46-14-202, MCA (2021). The evaluation concluded Smith was suffering from delusions and a mental disorder at the time of the offense but was able to conform his behavior to the law and acted with knowledge and purpose. However, statements made for the purpose of the § 46-14-202, MCA (2021),

show mitigation. Whether JUOF and mental disease or disorder may be raised as alternative defenses is therefore not at issue here.

20

examination are inadmissible in evidence for any purpose other than the person's mental condition. Section 46-14-217, MCA. Moreover, such statements are "admissible on the issue of the person's mental condition . . . only when *and after* the defendant presents evidence that *due to a mental disease or disorder* the defendant did not have a particular state of mind that is an element of the offense charged." Section 46-14-217, MCA (emphasis added). Smith did not assert a mental disease or disorder defense, and therefore these records are inadmissible.[5]

¶43    Even if evidence from the evaluation was admissible, it would not be helpful to Smith's defense. The MSH evaluation concluded

> His actions on the day in question, although disinhibited to some degree, appear to be the result of more longstanding personality traits and a general tendency toward impulsivity, as opposed to a limited capacity to control his behavior as a result of his psychosis. His actions leading up to and following the altercation were fairly calm, goal-directed, and cooperative which suggests an intact ability to control his behavior.

This evidence contradicts Smith's theory that a mental disease or disorder resulted in extreme mental or emotional distress sufficient to mitigate his culpability. Rather, it supports the notion he acted deliberately without evidence of mitigation.

---

[5] They are inadmissible as a protection for the accused. In the course of a multi-day or multi-week comprehensive mental evaluation, the defendant generally speaks at length about his or her conduct around the events of the alleged offense. If those statements were generally admissible for the State without requiring the trigger of the defendant putting his or her mental health at issue, it would be unfair to the defendant and it would end a defendant's incentive to cooperate with a mental health diagnosis and treatment.

## B. No Other Evidence Supported Mitigation

¶44 Smith asserted at oral argument and in his brief there was sufficient evidence of mitigation at trial to warrant an instruction on the lesser offense of mitigated deliberate homicide. But Smith fails to provide the evidence to support his argument.

¶45 Initially, Smith could have called as witnesses—but didn't—two counselors who had spoken to him prior to the homicide and found he suffered from delusions. Although he did not present a mental disease or disorder defense, Smith was admittedly intending to "bootstrap some of that testimony" into a mitigated deliberate homicide argument. Smith also argued his claim of Patterson's attack was sufficient provocation for him to experience extreme mental or emotional distress and justify his conduct.

¶46 Addressing the last point first, Smith essentially argues a person's threat to another, giving rise to justifiable use of force, also gives rise to an instruction for mitigation. At trial, Smith testified he "snapped" after the victim shot him from point blanked range. He now claims a jury could find "the imminent use of unlawful force by another against a defendant was a reasonable explanation or excuse for the defendant's extreme mental or emotional distress that led to the use of force." We are not persuaded the District Court abused its discretion in denying the mitigation instruction based on Smith's testimony that he "snapped" when threatened by Patterson's firearm. We also note Smith's theory as applied to this case contradicts our reasoning in *Martinez* because it offers an affirmative defense that, if believed, renders the lesser included offense unnecessary, and if not believed, offers no evidence in support of the lesser offense. For example, if the jury believed Smith was justified (by Patterson's aggression) in using force that ultimately

killed Patterson, Smith would be entitled to acquittal, not conviction of the lesser offense. Under Smith's theory, as we held in *Martinez*, "there would have been no evidence at all" to support the lesser included offense if the jury discounted Smith's testimony on this point. *Martinez*, ¶ 15.

¶47 Smith next argues evidence of mental state is viable on the element of "extreme mental or emotional distress for which there is a reasonable explanation or excuse" in the lesser included offense of mitigated deliberate homicide. He disputes the State's argument that "internally derived" mental distress, like that arising from mental illness, is insufficient for mitigation and argues the "externally derived" mental distress argument from the State is without legal support. The State responds that our caselaw requires mitigating factors to arise from "some sort of direct provocation," not merely Smith's anger, stress, or irritation.

¶48 We agree the defendant's mental state at the time of the offense might be relevant for defenses other than mental disease or disorder. *See Park v. Mont. Sixth Jud. Dist. Ct.*, 1998 MT 164, ¶ 26, 961 P.2d 1267, 289 Mont. 367 ("Mitigated deliberate homicide is an affirmative defense which clearly depends on proof of Park's mental state at the time of the acts alleged, and he has notified the State that he intends to prove his mental condition through use of expert psychological or psychiatric testimony."); *State v. Hess*, 252 Mont. 205, 213, 828 P.2d 382, 388 (1992) ("Clara put her mental state at issue when she relied upon the defense of justifiable use of force based on battered woman syndrome and offered the testimony of Dr. Lenore Walker in support of that defense.").

¶49 Section 45-5-103, MCA, defines mitigated deliberate homicide as a homicide committed "under the influence of extreme mental or emotional stress for which there is

23

[a] reasonable explanation or excuse." We have repeatedly held a defendant must show direct provocation to constitute a "'reasonable explanation or excuse' for the defendant's extreme emotional disturbance." *Hans v. State*, 283 Mont. 379, 397, 942 P.2d 674, 685 (1997); *Martin*, ¶ 33 ("This requires evidence of an extreme emotional stress resulting from provocation of some sort, in the form of a reasonable excuse or explanation."); *State v. MacGregor*, 2013 MT 297A, ¶ 50, 372 Mont. 142, 311 P.3d 428 ("[M]itigating factors arise from some sort of direct provocation, not simply the buildup of stress and anger."). Mental disease or disorder evidence cannot therefore be the sole basis for a mitigated deliberate homicide theory absent evidence of direct provocation sufficient to constitute a reasonable explanation or excuse for the defendant's extreme mental or emotional stress.

¶50    In *Hans*, this Court reviewed whether Hans's attorney provided ineffective assistance by misinforming Hans regarding the nature of mitigated deliberate homicide as a lesser included offense. *Hans*, 283 Mont. at 395, 942 P.2d at 683-84. The attorney used the term "heat of passion" to describe the "reasonable explanation or excuse" required to prove mitigation. *Hans*, 283 Mont. at 395, 942 P.2d at 684. Hans argued this was an outdated theory that became no longer applicable once the Legislature enacted § 45-5-103, MCA (1985). *Hans*, 283 Mont. at 396, 942 P.2d at 684. In support, Hans pointed out "the annotations to § 45-5-103, MCA, indicate that the defense is no longer limited to the 'heat of passion' situation," and "the comments to Model Penal Code § 210.3 upon which § 45-5-103, MCA, was based . . . indicate that the new definition is not as limited as the traditional rule of provocation." *Hans*, 283 Mont. at 396, 942 P.2d at 684. However, we found "counsel's use of 'heat of passion' . . . conveyed the substance of the offense" due

24

to the pivotal role provocation holds as "an integral component of . . . 'mitigated deliberate homicide.'" *Hans*, 283 Mont. at 397, 942 P.2d at 685. Although *sudden* provocation is no longer required to show extreme emotional distress, a degree of provocation sufficient to constitute a reasonable explanation or excuse remains necessary. *Hans*, 283 Mont. at 399, 942 P.2d at 686.

¶51    We further clarified the role of provocation in *Martin*. In *Martin*, we held "evidence concerning the look on [Martin's] face after he shot Heinle, and his unemployment, homelessness, and pregnant girlfriend do not indicate an extreme emotional stress." *Martin*, ¶ 34. The presence of such internal stressors did not indicate Martin's actions were *provoked*. *Martin*, ¶ 34; *see also State v. Goulet*, 283 Mont. 38, 42, 938 P.2d 1330, 1332-33 (1997) (holding that internal stressors such as the defendant's anger or intoxication were insufficient to warrant an instruction on mitigated deliberate homicide).

¶52    Likewise, in *MacGregor*, MacGregor was charged with two counts of attempted deliberate homicide for attempting to kill his wife and live-in nanny. *MacGregor*, ¶ 8. MacGregor argued an attempted mitigated deliberate homicide instruction was proper because:

> he was intoxicated on marijuana and alcohol; he was upset about an incident where his dog knocked over his child; his child had been diagnosed with a minor ailment; he had fired someone recently; he had quit cigarettes, marijuana, and alcohol (although not that day); he had worked 60–hour work weeks; he had cut his hand; and his wife forgot their anniversary.

*MacGregor*, ¶ 50. Consistent with our other caselaw, we held "mitigating factors arise from some sort of *direct* provocation, not simply the buildup of stress and anger." *MacGregor*, ¶ 50 (citing *Hans*, 283 Mont. at 399, 942 P.2d at 686) (emphasis added).

25

¶53    The foregoing discussion makes it clear that the defendant's mental illness or other evidence of mental state may be relevant for purposes of proving he or she was suffering extreme mental or emotional distress.   But our long-standing caselaw also requires evidence of some type of provocation to meet the "reasonable explanation or excuse" qualifier.   Smith failed to marshal evidence of these factors at trial.   The District Court excluded the evidence from Smith's counselors as a discovery sanction pursuant to § 46-15-329(4), MCA, for Smith's dilatory tactics in raising or asserting any mental disease or disorder evidence.   *See, e.g.*, *State v. Henson*, 2010 MT 136, ¶¶ 28–31, 356 Mont. 458, 235 P.3d 1274 (affirming district court sanction excluding psychiatric evaluation as untimely).   Smith does not appeal this discovery sanction.   We do not address issues not raised by the parties on appeal.[6]

¶54    Thus, Smith does not assert any admissible evidence—or evidence he did not voluntarily withdraw—that would have supported his mitigated deliberate homicide instruction had the District Court given it.   At oral argument, Smith's counsel asked us to remand so the District Court could decide some of these evidentiary issues.   But Smith did not make an offer of proof at the District Court as to what other evidence he may have presented given the opportunity.   *See* M. R. Evid. 103(a)(2); *State v. King*, 2013 MT 139,

---

[6] Apparently, Smith also voluntarily dropped these potential witnesses as with Smelko.  Although Smith dropped these potential witnesses after the District Court's motion in limine, the timing appears related to the negative psychological evaluation rather than the court's order.  The court entered its order on March 28, 2022.  On April 8, Smith submitted an amended notice of witnesses which still included the counselors.  On April 11, Smith received the negative psychological evaluation.  Four days later, Smith filed a second amended notice of witnesses, which no longer included the counselors as potential witnesses.

¶ 37, 370 Mont. 277, 304 P.3d 1 ("The reason for M. R. Evid. 103(a)(2) 'is to require that if evidence is excluded there must be an offer of proof so that neither the trial court nor this Court has to speculate concerning what the evidence would have been.'" (quoting *In re O.A.W.*, 2007 MT 13, ¶ 51, 335 Mont. 304, 153 P.3d 6)); *State v. Raugust*, 2000 MT 146, ¶ 27, 300 Mont. 54, 3 P.3d 115. Without an offer of proof, or some other indication in the record on what evidence Smith was unable to introduce, the issue is waived. *Raugust*, ¶ 27 ("The failure to make an adequate offer of proof results in a waiver of the issue on appeal.").

¶55 To clarify, while generally "a motion in limine may preserve an issue for appeal in some instances even though a contemporaneous objection to an alleged error is not made at trial," the motions in limine here were not sufficient to preserve the issue. *State v. Byrne*, 2021 MT 238, ¶ 20, 405 Mont. 352, 495 P.3d 440 (citing *State v. Favel*, 2015 MT 336, ¶ 17, 381 Mont. 472, 362 P.3d 1126). This is because Smith did not present any mental disease or disorder evidence at the time the District Court ruled on the motions. After ruling on the motions and once Smith was evaluated, leading to the rise of potential mental disease or disorder evidence, Smith would have needed to make an offer of proof to preserve the issue. However, because Smith failed to make an offer of proof, the District Court was not given the opportunity to consider the specific evidence and how it could have supported a mitigation instruction. Therefore, Smith did not successfully preserve the issue.

¶56 Seeing no admissible evidence Smith was prevented from offering that would meet that burden, we decline to upset the jury's verdict.

27

¶57    *Issue Two: Whether failing to review the District Court's alleged error of responding to mid-trial questions from jurors without consulting the parties would result in a manifest miscarriage of justice.*

¶58    Smith asks us to invoke plain error review over the District Court's handling of two evidentiary questions received from jurors during trial. The first question concerned whether certain rounds were or were not fired from Patterson's gun. The second question pertained to the collection of DNA. The court instructed the bailiff on each occasion to inform the juror the question was evidentiary and could not be answered by the judge. The judge also informed the parties he had done so, and Smith did not object.

¶59    We generally do not address issues not objected to at the district court and raised for the first time on appeal. *Akers*, ¶ 12. We may exercise plain error review where a defendant's fundamental rights are invoked and failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceeding or may compromise the integrity of the judicial process. *Akers*, ¶ 13. We invoke the plain error doctrine "sparingly, on a case-by-case basis, considering the totality of the circumstances of each case." *Akers*, ¶ 13 (internal quotations omitted); *see also City of Missoula v. Charlie*, 2025 MT 85, ¶¶ 17–18, 421 Mont. 403, 567 P.3d 922. We decline to do so here.

¶60    Smith argues the record shows the jury began discussing the evidence and deliberating before being instructed to do so. But the record does not reflect Smith's concerns. Each note was signed by a different juror, neither of whom became the jury foreman. The notes were from individual jurors and do not indicate any sort of debate or collective question. Neither of the questions signaled or suggested any bias towards Smith.

28

The questions do not indicate either juror had formed any conclusions regarding Smith. The notes also do not suggest the jury improperly discussed the case amongst themselves. Nor does Smith explain how the District Court's direction to the bailiff to tell the juror the court could not discuss an evidentiary issue affected his right to a fair and impartial jury such that a manifest miscarriage of justice resulted when Smith did not ask the court to make further inquiry of the jury or otherwise object to its handling of the questions. "We presume the jury upholds its duty and follows a district court's instructions," which in this case included a reminder not to discuss the case with other jurors during every break until the jury was sent back to deliberate. *State v. Erickson*, 2021 MT 320, ¶ 27, 406 Mont. 524, 500 P.3d 1243.

¶61 Additionally, this case is distinguishable from *State v. Tapson*, 2001 MT 292, 307 Mont. 428, 41 P.3d 305, upon which Smith relies. There, the judge entered the jury room alone after deliberations began "'to advise the jury of how to proceed.'" *Tapson*, ¶ 35 (quoting the record).

> Tapson could not show what advice, if any, the Judge gave to the jurors and how that might have affected their deliberations or verdict; he could not show what questions, if any, the jurors might have asked and how those were answered; and neither he nor his counsel could gauge the subtleties of facial expression or body language of the jurors or the court that might have provided grounds for objection.

*Tapson*, ¶ 35. Here, the record reflects the judge did not enter the juror room nor did he advise any juror in any way. Moreover, the record contains the jurors' questions and the judge's refusal to answer them. *See State v. Northcutt*, 2015 MT 267, ¶¶ 12, 18–19,

29

381 Mont. 81, 358 P.3d 179; *see also State v. Kennedy*, 2004 MT 53, ¶¶ 32–34, 320 Mont. 161, 85 P.3d 1279.

¶62 We decline to exercise plain error review here. Smith has not met his burden to show that failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceeding, or may compromise the integrity of the judicial process.

## CONCLUSION

¶63 The District Court erred in its pretrial ruling that Smith could not alternatively argue justifiable use of force and mitigated deliberate homicide as a lesser-included offense. Both instructions should be given if the evidence at trial supports the instruction. However, Smith did not demonstrate any admissible evidence he was prevented from presenting to the jury in support of a lesser included offense of mitigated deliberate homicide here and thus has not demonstrated prejudice requiring reversal. Smith has also failed to meet his burden to warrant plain error review of his claimed error in the District Court's handling of two evidentiary questions received by individual jurors prior to deliberations.

¶64 Affirmed.

/S/ CORY J. SWANSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ KATHERINE M. BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ JIM RICE